[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-15093

_____

D.C. Docket No. 2:12-cr-14022-KMM-1

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

versus

ALEXANDER MICHAEL ROY,

Defendant - Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(August 5, 2014)

Before ED CARNES, Chief Judge, WILSON, Circuit Judge, and DALTON,[*] District Judge.

WILSON, Circuit Judge:

This appeal involves a defense attorney's temporary absence from the

courtroom at his client's trial when inculpatory testimony was admitted into

---

[*] The Honorable Roy B. Dalton, Jr., United States District Judge for the Middle District of Florida, sitting by designation.

evidence and contributed to his conviction.  Appellant Alexander Michael Roy (Roy) alleges that his criminal conviction was obtained in violation of the Sixth Amendment and the Supreme Court's holding in *United States v. Cronic*, 466 U.S. 648, 659, 104 S. Ct. 2039, 2047 (1984), which creates a presumption of prejudice and requires a new trial when counsel is absent during a "critical stage" of the trial. Because (1) Roy was a sole defendant during his criminal trial, (2) the afternoon session of Roy's trial commenced while his counsel was actually and physically absent, and (3) during that absence, evidence directly inculpating Roy in a crime for which he was eventually convicted was presented to the jury, we conclude that Roy was denied counsel at a critical stage, and based on *Cronic*, we are required to reverse Roy's conviction as to all counts of the indictment and remand the case to the district court for a new trial.

## I.

Pursuant to a "reverse sting" operation conducted in conjunction with the Osceola County Sheriff's Office (OCSO), Detective Athena Ross of the Sumter County Sheriff's Office (SCSO) placed an advertisement on Craigslist purportedly soliciting sex for two women.  Roy responded to the advertisement, after which Ross, acting undercover, told Roy that the advertisement was for herself, a thirty-year-old woman named Denise, and her daughter, a thirteen-year-old girl named Torie.  Roy, "Denise," and "Torie" (played by a second undercover SCSO

2

detective) discussed various potential sexual activities by email, telephone, and text message.  Eventually, they arranged a meeting at a Waffle House restaurant in Kissimmee, Florida.  Roy drove to the restaurant and entered the parking lot, but he drove away without ever parking his vehicle.  OCSO deputies pulled him over and arrested him, finding condoms and lubricant in his pockets.

OCSO conducted two searches of Roy's home, leading to the seizure of a desktop computer, a laptop, a thumb drive, and three compact discs, all of which contained photographs and videos containing child pornography.  Detectives also found the text of online conversations Roy had with L.B., a minor with whom Roy had carried on a romantic relationship.  L.B. was depicted in some of the pornography found on his computer, which Roy himself created.  Much of the child pornography depicted other underage girls.

Roy was indicted by a federal grand jury in the Southern District of Florida on one count of enticing or attempting to entice a minor to engage in sexual activity in violation of 18 U.S.C. § 2422(b) (Count 1) and four counts of possession of child pornography in violation of 18 U.S.C. § 2252(a)(4)(B) and (b)(2) (Counts 2–5).  A motion to suppress the evidence seized during the execution of the warrants was denied.

During a portion of Roy's jury trial, defense counsel was absent from the courtroom immediately following a lunchtime recess.  There was no explanation

3

for the absence in the record.  Prior to the recess, the court had stated that the trial would recommence at 1:30 p.m.  Instead, it started at 1:29 p.m. without defense counsel present; counsel did not arrive until 1:36 p.m.  The record does not reflect any reaction by the court or the government either to counsel's absence or to his late arrival, though the court reporter did note both in the transcript.  During counsel's absence, the government offered the following testimony from its computer forensics expert witness, Detective Charlie Longson of OCSO:

> Q.    Now, did you have occasion to find during your forensic examination a folder on the desktop computer named "My Pictures," which would fall within the "My Documents" file that was on that computer?
>
> A.    Yes, I did.
>
> Q.    And within the "My Pictures" folder, were there other subfolders?
>
> A.    Yes.
>
> Q.    And how were they categorized within that general folder of "My Pictures"?
>
> A.    Those folders were categorized by date, the year first, month second, and the date third.
>
> Q.    And were you able to determine any folders that had—or contained notable images within them?
>
> A.    Yes.  I did find folders with notable images.
>
> Q.    And what were—what was the first folder of concern that you found?

4

A.    The first one I found was named "2006-03-11."

Q.    And would that folder have been created by a user of that computer?

A.    Yes, it was.

Q.    And did you find any images within that folder?

A.    Yes, I did.  I found six images.

Q.    And would you please describe the images to the ladies and gentlemen of the jury within that March 11, 2006, folder that you found?

A.    These images are a nude white female who was bound to a table by her feet with rope.  The subject was laid across the table and had her head covered with an orange cloth which was secured around her neck with silver duct tape.

Q.    Were you able to determine forensically how those pictures had been taken?

A.    Yes.  They were taken with a Kodak v530 zoom digital camera.

Q.    And were you able to determine forensically a date and time those images were taken?

A.    Yes, I was.  These were taken on March the 10th, 2005, at 6:49 p.m.

Counsel returned soon after this exchange and, upon his return, did not raise any objections.  Direct examination of Detective Longson continued uninterrupted.  Detective Longson later testified as to the identity of the individual portrayed in the photographs, L.B., as well as her date of birth: May 9, 1989.  The jury found Roy guilty on all counts, and the district court sentenced him to life imprisonment.

5

Roy raises four claims on appeal.  Of these, we address only the Sixth Amendment denial of counsel claim.  Specifically, Roy contends that his counsel's absence occurred during a critical stage of trial when inculpatory evidence was admitted against him and that, therefore, he is entitled to a new trial pursuant to *Cronic*, 466 U.S. at 658–59, 104 S. Ct. at 2046–47.

## II.

"The claim that the temporary absence of trial counsel during the taking of evidence constitutes a Sixth Amendment violation presents a mixed question of law and fact and, as such, is subject to plenary review."  *Vines v. United States*, 28 F.3d 1123, 1127 (11th Cir. 1994).

A criminal defendant is entitled to the "Assistance of Counsel for his defence."  U.S. Const. amend VI.  In *Cronic*, the Supreme Court "conclude[d] that a trial is unfair if the accused is denied counsel at a critical stage of his trial."  466 U.S. at 659, 104 S. Ct. at 2047; *see also Bell v. Cone*, 535 U.S. 685, 695–96, 122 S. Ct. 1843, 1851 (2002) (listing the three bases for the *Cronic* presumption: (1) "complete denial of counsel," including at a critical stage; (2) failure by counsel "to subject the prosecution's case to meaningful adversarial testing;" and (3) "where counsel is called upon to render assistance under circumstances where competent counsel very likely could not").

## A.

Roy contends that he was denied counsel at a critical stage of his trial when the government recommenced direct examination of Detective Longson during his counsel's absence from the courtroom.  We must first decide, then, whether the portion of trial conducted in the absence of defense counsel was in fact a critical stage.  Although there is no strict test or definition for a critical stage of trial, the Supreme Court, other United States Courts of Appeals, and our own precedent provide us with guideposts to help answer that question.

In *Vines*, we did not apply a *Cronic* presumption of prejudice when Vines's lawyer was absent during the presentation of testimony to the jury.  28 F.3d at 1128.  Vines was charged with possession of cocaine with intent to distribute and conspiracy to possess cocaine with intent to distribute.  *Id.* at 1125.  The district court excused Vines's counsel on the first day of trial at 4:15 pm.[1]  *Id.* at 1125–26.  During his absence, two witnesses testified.  *Id.* at 1126.  One witness testified about the arrest of Vines's co-defendant.  *Id.*  The second witness, who was part owner and operator of the warehouse where the shipment containing the cocaine was received, "simply testified about leasing the space."  *Id.*  Vines was convicted of the possession charge but was acquitted of conspiracy.  *Id.*  On appeal from the district court's denial of his 28 U.S.C. § 2255 motion, "we decline[d] to give birth

---

[1] We did not decide whether Vines waived his right to counsel because, after determining that his counsel's absence was a trial error rather than a structural defect, we decided any constitutional deprivation was harmless.  *Vines*, 28 F.3d at 1129–31.

7

to a rule that the taking of evidence is necessarily a critical stage of trial [and found] that no evidence directly inculpating Vines was presented during his counsel's absence." *Id.* at 1128.  Because "no evidence directly inculpating [Vines was] presented while [his] counsel [was] absent, we decline[d] to hold that counsel was absent during a critical stage of trial within the meaning of *Cronic.*"  *Id.*

*Vines*, however, does not control our analysis because counsel here was absent during the presentation of testimony directly inculpating Roy.  Before counsel returned, the following evidence was admitted through the testimony of Detective Longson, a witness for the prosecution:

> Q.    And how were they categorized within that general folder of "My Pictures"?
>
> A.    Those folders were categorized by date, the year first, month second, and the date third.
>
> Q.    And were you able to determine any folders that had—or contained notable images within them?
>
> A.    Yes.  I did find folders with notable images.
>
> Q.    And what were—what was the first folder of concern that you found?
>
> A.    The first one I found was named "2006-03-11."
>
> Q.    And would that folder have been created by a user of that computer?
>
> A.    Yes, it was.
>
> Q.    And did you find any images within that folder?

8

A.   Yes, I did.  I found six images.

Q.   And would you please describe the images to the ladies and gentlemen of the jury within that March 11, 2006, folder that you found?

A.   These images are a nude white female who was bound to a table by her feet with rope.  The subject was laid across the table and had her head covered with an orange cloth which was secured around her neck with silver duct tape.

Q.   Were you able to determine forensically how those pictures had been taken?

A.   Yes.  They were taken with a Kodak v530 zoom digital camera.

Q.   And were you able to determine forensically a date and time those images were taken?

A.   Yes, I was.  These were taken on March the 10th, 2005, at 6:49 p.m.

That testimony, given during counsel's absence, established the date on which some images at issue were created, that the folders in which they were contained would "have been created by a user of that computer," and the content of those images.  The district court's instructions to the jury on the possession counts included the following:

The Defendant can be found guilty of [possession of child pornography] only if all the following facts are proved beyond a reasonable doubt: [(1)] [t]he Defendant knowingly possessed a visual depiction; [(2)] [t]hat the depiction was shipped or transported in interstate or foreign commerce by any means including a computer or that was produced using material that had been mailed, shipped, or transported in interstate or foreign commerce; [(3)] [t]hat producing the visual depiction involved the use of a minor engaged in sexually

9

explicit conduct; [(4)] [t]hat the depiction is of a minor engaged in sexually explicit conduct; and [(5)] [t]hat the Defendant knew that at least one performer was a minor and knew that the depiction showed the minor engaged in sexually explicit conduct.

The evidence presented to the jury during counsel's absence, therefore, provided a basis for conviction on those jury instructions. The testimony that "a user of that computer" would have created the folders containing the pornographic images supports the conclusion that Roy "knowingly possessed a visual depiction." The identification of the date on which the images were created, when combined with Detective Longson's later identification of the subject's date of birth, and the description of the content of the images supported the third, fourth, and fifth elements—that the images "involved the use of a minor engaged in sexually explicit conduct;" that they were "of a minor engaged in sexually explicit conduct;" and that Roy "knew that [they] showed the minor engaged in sexually explicit conduct."

Thus, this case is markedly different from our prior decision in *Vines*. Here, the government presented the jury with directly inculpatory evidence on a count for which Roy was ultimately convicted while his attorney was absent from the courtroom. In *Vines*, the government did not present evidence of Vines's own wrongdoing, and he was acquitted on the conspiracy charge, severing any potential imputation of his co-defendants' wrongdoing to him. 28 F.3d at 1126, 1128 ("Upon review of the record, we find that no evidence directly inculpating Vines

10

was presented during his counsel's absence. Where, as in this case, no evidence directly inculpating a defendant is presented while that defendant's counsel is absent, we decline to hold that counsel was absent during a critical stage of trial within the meaning of *Cronic*."); *cf. United States v. Russell*, 205 F.3d 768, 772 (5th Cir. 2000) (distinguishing the case presented, in which evidence directly inculpating only Russell's co-conspirators was presented during counsel's absence, from *Vines* because Russell was convicted of conspiracy, while Vines was acquitted of the conspiracy charge). Hence, we must decide whether the presentation of *directly inculpatory* testimony materially distinguishes this case from *Vines* and constitutes a critical stage of a criminal trial.

Whether a portion of trial is critical is a categorical question; it is not the unique facts of a particular trial that decide the issue but the nature of the stage. *See Van v. Jones*, 475 F.3d 292, 301–02 (6th Cir. 2007) (emphasizing the "accentuat[ion of] the categorical nature of [the critical stage] inquiry"); *Burdine v. Johnson*, 262 F.3d 336, 347 (5th Cir. 2001) ("To justify a particular stage as critical, the Court has not required the defendant to explain how having counsel would have altered the outcome of his specific case. Rather, the Court has looked to whether the substantial rights of a defendant may be affected during that type of proceeding." (internal quotation marks omitted)); *cf. Hunter v. Moore*, 304 F.3d

11

1066, 1070 (11th Cir. 2002) (concluding that closing argument is categorically a critical stage).

One working definition of a critical stage for purposes of *Cronic* is that set forth by the Sixth Circuit in *Van* after it considered a quintet of Supreme Court opinions as well as one of its own: whether "a reasonable likelihood that [substantial prejudice to the defendant's rights] will arise from complete absence of counsel." 475 F.3d at 313. The Supreme Court opinions on which *Van* relied hold that a critical stage arises when "[a]vailable defenses may be . . . irretrievably lost, if not then and there asserted," *Hamilton v. Alabama*, 368 U.S. 52, 54, 82 S. Ct. 157, 159 (1961), "where rights are preserved or lost," *White v. Maryland*, 373 U.S. 59, 60, 83 S. Ct. 1050, 1051 (1963) (per curiam), "whenever necessary to assure a meaningful 'defence,'" *United States v. Wade*, 388 U.S. 218, 225, 87 S. Ct. 1926, 1931 (1967), where "'potential substantial prejudice to defendant's rights inheres in the . . . confrontation and the ability of counsel to help avoid that prejudice,'" *Coleman v. Alabama*, 399 U.S. 1, 9, 90 S. Ct. 1999, 2003 (1970) (alteration in *Coleman*) (quoting *Wade*, 388 U.S. at 227, 87 S. Ct. at 1932)), and when the stage holds "significant consequences for the accused," *Bell*, 535 U.S. at 696, 122 S. Ct. at 1851. *See Van*, 475 F.3d at 312.

Consideration of these precedents, as well as the Sixth Circuit's helpful standard, convinces us that Roy's counsel was absent during a critical stage of his

12

trial.  It is clear that there exists "a reasonable likelihood that [substantial prejudice to the defendant's rights] will arise from complete absence of counsel" during the presentation of directly inculpatory testimony to the jury.  *Van*, 475 F.3d at 313. The absence of counsel during the presentation of inculpatory evidence used by the government to convict the defendant eliminates the opportunity to decide whether to lodge an objection and how to frame the objection, as well as the ability to conduct cross-examination.  *See Davis v. Alaska*, 415 U.S. 308, 318, 94 S. Ct. 1105, 1111 ("[D]eni[al of] the right of effective cross-examination [is] constitutional error of the first magnitude and no amount of showing of want of prejudice would cure it."  (internal quotation marks omitted)).  Indeed, a defendant may irretrievably lose available defenses and rights during direct testimony of a prosecution witness.  *See Hamilton*, 368 U.S. at 54, 82 S. Ct. at 159; *White*, 373 U.S. at 60, 83 S. Ct. at 1051.  The presence of counsel during the examination of an adverse witness is "necessary to assure a meaningful 'defence.'"  *See Wade*, 388 U.S. at 225, 87 S. Ct. at 1931.

The present case presents a circumstance substantially similar to the Sixth Circuit decision in *Green v. Arn*, 809 F.2d 1257 (6th Cir.), *vacated and remanded on other grounds*, 484 U.S. 806, 108 S. Ct. 52 (1987), *reinstated on remand*, 839 F.2d 300 (6th Cir. 1988).  In *Green*, a habeas corpus petitioner had been jointly tried with two other co-defendants.  *Id.* at 1259.  The co-defendants were

13

represented by a separate lawyer than that of Ms. Green.  *Id.*  Green's lawyer "was absent during a critical part of the afternoon" of the trial, and although co-counsel was present, Green's lawyer was not.[2]  *Id.* at 1259–61.  During Green's lawyer's absence, co-defendants' counsel conducted cross-examination of a prosecution witness.  *Id.* at 1259.  Green was convicted of kidnapping and gross sexual imposition.  *Id.*  Affirming the grant of a writ of habeas corpus, the Sixth Circuit determined that "[t]he presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial."  *Id*. at 1263 (quoting *Cronic*, 466 U.S. at 659, 104 S. Ct. at 2047).  The Sixth Circuit went even further to say that "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable".  *Id.* (quoting *Cronic*, 466 U.S. at 659, 104 S. Ct. at 2047).  And when the Sixth Amendment claim is, as here, "the denial, rather than the ineffective assistance, of counsel, the criminal defendant need only show that counsel was absent during a critical stage of the proceedings in order to establish the constitutional violation.  *Absence from the proceedings is deficient performance as a matter of law, and prejudice is presumed*."  *Id.* (emphasis added).

---

[2] Notably, the absence may have been as short as five minutes, as the government argued; Green asserted that it was nearly two hours long.  *Green*, 809 F.2d at 1265 (Boggs, J., dissenting).

14

## B.

The Fifth Circuit agrees that *Cronic* prejudice arises when the defendant is deprived of the presence of counsel during the presentation of inculpatory testimony to the jury.  In *Russell*, the defendant was charged with and convicted of (1) conspiracy to possess cocaine and marijuana with intent to distribute, and (2) conspiracy to launder money that was the proceeds of a drug transaction.  205 F.3d at 769.  Russell's attorney was absent for two days of a joint trial while ill without Russell's waiver.  *Id.* at 769–70, 771.  Counsel for a co-defendant volunteered to sit in for Russell's counsel, and "[t]he district court instructed the government not to call any witness relevant to Russell" while Russell's counsel was absent.  *Id.* 769–70.  During counsel's absence, none of the testimony presented "directly implicated Russell," but evidence relating to the conspiracy, which detailed the co-conspirators' attempts to launder money and import marijuana, was introduced.  *Id.* at 770.  Prior to the absence of counsel, the government had presented evidence "about Russell's management of the distribution of marijuana operations and involvement in providing [a co-conspirator] with funds."  *Id.*  The evidence presented during counsel's absence therefore "flowed directly from Russell's role in the money laundering conspiracy to the roles of [his co-conspirators] in the same money laundering conspiracy and the overall conspiracy to import and distribute marijuana."  *Id.*  Russell filed a motion to vacate the sentence pursuant to 28

15

U.S.C. § 2255, which the district court denied. *Id.* at 769. Although declining to adopt a "bright line rule that the taking of any evidence at trial in the absence of counsel is prejudicial per se,"[3] *id.* at 771, the Fifth Circuit determined that counsel was denied at a critical stage and that the *Cronic* presumption applied because "Russell [was] without counsel as the probability of his guilt increased during the government's presentation of evidence against his co-conspirators," *id.* at 772. Russell's conviction was reversed, and the case was remanded for a new trial. *Id.* at 773.

Here, as in *Russell*, "the probability of [Roy's] guilt increased during the government's presentation of evidence," *Russell*, 205 F.3d at 772, and "[i]t is difficult to perceive a more critical stage of a trial than the taking of evidence on the defendant's guilt," *Green*, 809 F.2d at 1263. At Roy's trial, evidence admitted to prove that Roy knowingly possessed photographs of a minor engaged in sexually explicit conduct was presented to the jury during his lawyer's absence from the courtroom. The absence constitutes "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." *Cronic*, 466 U.S. at 658, 104 S. Ct. at 2046. We therefore find that

---

[3] Compare this with our conclusion in *Vines*: "[W]e decline to give birth to a rule that the taking of evidence is necessarily a critical stage of trial" where "no evidence directly inculpating Vines was presented during his counsel's absence." 28 F.3d at 1128.

16

Roy was deprived of his Sixth Amendment right to counsel at a critical stage of his trial and that *Cronic* requires a reversal of his convictions.

## C.

Typically, where an appellant demonstrates constitutional error, an appellate court will not disturb a conviction if the government is able to show that the error "was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828 (1967).  Courts applying the *Cronic* presumption of prejudice where counsel was denied at a critical stage have reached varying conclusions regarding the applicability of harmless error review under those circumstances.  *Compare Siverson v. O'Leary*, 764 F.2d 1208, 1217–19 (7th Cir. 1985) (applying harmless error review to *Cronic* error), *with Green*, 809 F.2d at 1263 (failing to apply harmless error review to the facts before it).  We, however, have previously held that "structural error exists where counsel is 'prevented from assisting the accused during a critical stage of the proceeding.'" *United States v. Arbolaez*, 450 F.3d 1283, 1295 (11th Cir. 2006) (per curiam) (quoting *Cronic*, 466 U.S. at 659 n.25, 104 S. Ct. at 2047 n.25).  Structural error is not subject to harmless error review.  *See Arizona v. Fulminante*, 499 U.S. 279, 309, 111 S. Ct. 1246, 1265 (1991) (Rehnquist, C.J., maj. op.) ("These are structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error'

standards."); *Vines*, 28 F.3d at 1129 ("Trial errors are subject to harmless-error analysis; structural defects are not.").

As we have stated, *Cronic* error is structural. "[A]ny deprivation of assistance of counsel constitutes reversible error and necessitates a new trial. *Our rule does not include a harmless error analysis. Cronic* and *Strickland*[4] make clear that where actual or constructive denial of assistance of counsel occurs a per se rule of prejudice applies." *Crutchfield v. Wainwright*, 803 F.2d 1103, 1108 (11th Cir. 1986) (en banc) (emphasis added) (internal quotation marks omitted). *Cronic* error necessitates a per se reversal. *See Smith v. Wainwright*, 777 F.2d 609, 616 (11th Cir. 1985) ("Where, however, a petitioner demonstrates that circumstances surrounding his representation give rise to a presumption of prejudice, he will prevail." (citing *Cronic*, 466 U.S. at 657 n.20, 104 S. Ct. at 2046 n.20)); *Harding v. Davis*, 878 F.2d 1341, 1345–46 (11th Cir. 1989) (reversing after finding *Cronic* error without conducting harmless error review); *Hunter*, 304 F.3d at 1070 ("[D]enial of counsel at a critical stage . . . warrants reversal without a specific showing of prejudice."); *Darden v. United States*, 708 F.3d 1225, 1228 (11th Cir.), *cert. denied* 133 S. Ct. 2871 (2013) ("When [denial of counsel at a critical stage or other *Cronic* error] occurs, the reviewing court presumes the defendant was prejudiced and his conviction is in turn vacated.").

---

[4] *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052 (1984).

Despite other Circuits' willingness to apply harmless error review to *Cronic* error generally, no Circuit has applied harmless error review upon a finding that a defendant was deprived of his lawyer during the presentation of inculpatory testimony to the jury and that such deprivation violated *Cronic*. Although the dissent makes a reference to *United States v. Kaid*, 502 F.3d 43 (2d Cir. 2007) (per curiam), *Kaid* has nothing to do with *Cronic*. The Second Circuit confined its review to "whether a defense attorney's purported twenty-minute absence from the courtroom during a testimonial phase of a criminal trial constitutes *ineffective assistance of counsel*." *Id.* at 44 (emphasis added). In other words, the Second Circuit worked under *Strickland*'s framework, not *Cronic*'s. *Id.* at 46–47.

In *Green*, the Sixth Circuit considered "whether harmless error analysis is appropriate where a petitioner demonstrates she was unrepresented by counsel for a critical period of time during the taking of evidence against her at trial." *Green*, 809 F.2d at 1258. Green was tried jointly with two other co-defendants who were represented by separate counsel. *Id.* at 1259. Green was represented by her retained counsel. *Id.* Although her lawyer was present during a portion of the afternoon session of a day of her trial, he was absent during a critical part of the afternoon. *Id.* As the Sixth Circuit stated, "the present case is one where a harmless error inquiry should be foreclosed. It is difficult to perceive a more critical stage of a trial than the taking of evidence on the defendant's guilt." *Id.* at

19

1263.  Further stated: "The absence of counsel during the taking of evidence on the defendant's guilt is prejudicial per se and justifies an automatic grant of the writ 'without any opportunity for a harmless error inquiry.'"  *Id.* (quoting *Siverson*, 764 F.2d at 1217 n.6).

The Seventh and District of Columbia Circuits have likewise determined that harmless error review is inappropriate when counsel is denied at certain critical stages.  *See Siverson*, 764 F.2d at 1217 n.6 ("We recognize that the lack of counsel at some critical stages may be considered prejudicial per se*,* and may result in automatic reversal of the defendant's convictions without any opportunity for a harmless error inquiry."); *United States v. Decoster*, 624 F.2d 196, 256 (D.C. Cir. 1976) (en banc) ("Thus, where the defendant had no counsel at all at a critical stage of his trial, automatic reversal of his conviction is usually in order.").

Harmless error review in a case like this one would be an exacting and problematic undertaking.  First, as a reviewing court, we could not accurately determine whether and to what extent counsel's absence prejudiced the defendant. *See* David A. Moran, *Don't Worry, I'll Be Right Back: Temporary Absences of Counsel During Criminal Trials and the Rule of Automatic Reversal*, 85 Neb. L. Rev. 186, 207–09 (2006).  It would be difficult, if not impossible, for us as a reviewing court to discern, on a cold record, the reaction of the jury to the evidence presented and, therefore, to what extent counsel may have been able to react in a

20

manner that would improve his client's likelihood of acquittal had he been present in the courtroom. *See id.* at 207 ("During an ongoing trial, real-world trial counsel make crucial decisions based on the reaction of the jury to testimony, evidence, argument, and other courtroom proceedings."). In other words, harmless error review under these circumstances either would give a defendant no meaningful opportunity to challenge his conviction for denial of counsel during presentation of inculpatory evidence or would require us to ignore relevant considerations simply because they cannot be discerned from the record. *See id.* at 209.

Upon his return to the courtroom, Roy's counsel failed to lodge an objection to the admission of the evidence that he missed. Of course, he could not have known what evidence he missed, as he was absent. The contemporaneous objection rule ordinarily requires a party to object to the introduction of evidence at the time it is introduced. *Puckett v. United States*, 556 U.S. 129, 135, 129 S. Ct. 1423, 1428–29 (2009). Failure to do so subjects that evidentiary ruling to plain error review. Fed R. Crim. P. 52(b); *Puckett*, 556 U.S. at 135, 129 S. Ct. at 1429. However, plain error review is inapplicable in this context. As *Cronic* notes, defense counsel's presence is assured "not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial," e.g., to ensure that someone is present to prevent the improper introduction of evidence. 466 U.S. at 658, 104 S. Ct. at 2046; *cf. Mickens v. Taylor*, 535 U.S. 162, 204, 122 S. Ct. 1237,

21

1261 (2002) (Souter, J., dissenting) ("Why excuse a judge's breach of judicial duty just because a lawyer has fallen down in his own ethics or is short on competence? Transforming the factually sufficient trigger of a formal objection into a legal necessity for responding to any breach of judicial duty is irrational. . . . The objection requirement works elsewhere because the objecting lawyer believes that he sights an error being committed by the judge or opposing counsel.  That is hardly the motive to depend on when the risk of error, if there is one, is being created by the lawyer himself . . . ." (citation omitted)); *Wood v. Georgia*, 450 U.S. 261, 265 n.5, 101 S. Ct. 1097, 1100 n.5 (1981) (holding that it was appropriate to consider a conflict issue not raised below because (1) defense counsel might be hesitant to raise it; (2) the government had to have been aware of the error; and (3) the record indicated that there might be such an issue).  The Fifth Circuit did not apply plain error review in *Russell*, 205 F.3d at 772–73, even though "[t]he district court did not speak to Russell or ask for his consent to the" absence, and counsel "did not question anything that took place in his absence," *id.* at 770.  Further, we have refused to subject *Cronic* error to plain error review even where counsel remained silent when the judge directed a verdict against the defendant, a blatant constitutional error.  *See Harding*, 878 F.2d at 1345–46.[5]  Therefore, plain error review is not applicable under these circumstances.

---

[5] Notably, in *Harding*, though the directed verdict was likely reversible plain error, *see*

Where, as here, structural error has occurred, the *entire* trial is unfair and the convictions as to all counts are tainted. *See Fulminante*, 499 U.S. at 309–10, 111 S. Ct. at 1265. The Supreme Court has defined structural errors as those where the reviewing court "can only engage in pure speculation" about what the jury might have done; their consequences are "necessarily unquantifiable and indeterminate." *Sullivan v. Louisiana*, 508 U.S. 275, 281–82, 113 S. Ct. 2078, 2082–83 (1993). Structural errors are "markedly different" from trial errors (which *can* be "quantitatively assessed"), and thus, structural errors "defy analysis by harmless-error standards." *Fulminante*, 499 U.S. at 308, 309, 111 S. Ct. at 1264–65 (internal quotation marks omitted). There are some errors that courts can accurately measure and hold harmless. This is not one of them. Especially here, where the charges are interrelated and evidence relevant to one count may have influenced the jury as to others.

## III.

We pause to address the concerns expressed by our dissenting colleague in his forceful dissent:

First, while maintaining that there was no *Cronic* error at all, the dissent suggests that even if counsel's absence taints the conviction as to Counts 2–5, we

---

*Rose v. Clark*, 478 U.S. 570, 578, 106 S. Ct. 3101, 3106 (1986), we reversed for *Cronic* error, not for the directed verdict. *See Harding*, 878 F.2d at 1345–46.

23

can separate out the evidence as to each count.  Therefore, Count 1, for which Roy received a life sentence, was unaffected by the evidence received during counsel's absence as to Counts 2–5.

But the government asked the jury to do the complete opposite at Roy's trial. Roy was charged in Count 1 with enticing or attempting to entice a minor to engage in sexual activity.  Counts 2–5 charged him with possession of child pornography on his computer which, according to the government's evidence, he viewed a couple of days before traveling to the Waffle House in Kissimmee, Florida, where his attempt to entice a minor allegedly occurred.  As the government stated in its closing argument:

> Well, we know where he went, ladies and gentlemen, and I submit to you we know what he was ultimately planning to do, *because his interest starts a couple days before*.

> You'll recall the evidence.  He's accessing his girl's folder on the laptop, he's accessing his Lily folder on the laptop . . . .  All that adds up to is little girls, ladies and gentlemen.  You got a teacher sitting here that's interested in little girls, because that's all he's got saved in his collection.  He's got it all backed up so if anything ever crashes, he's got it in disk form, he's got it in thumbnail form.  That's what he's interested in, and that wasn't entrapment, *because he was into little girls a long time before he ever showed up in Kissimmee, Florida*.

> *You know it because that's what he likes to look at on the Internet, as well*.

Later in his closing argument, the prosecutor continued to invite the jury to consider evidence admitted as to Counts 2–5 in connection with Count 1 as well:

24

He was predisposed.  You know that from all of these videos and pictures he likes to watch.

As Chief Justice Rehnquist wrote in *Fulminante*, a "structural defect affect[s] the framework within which the trial proceeds, rather than simply [acting as] an error in the trial process itself. . . . [Where structural error exists] a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." 499 U.S. at 310, 111 S. Ct. at 1265 (internal quotation marks omitted); *see also Vines*, 28 F.3d at 1129 ("[S]tructural defects . . . involve deprivations of constitutional protections so basic that in their absence no criminal trial can be deemed reliable, nor any punishment fundamentally fair."  (citation and internal quotation marks omitted)).  To examine the evidence separately as to each count when counsel has been denied makes little sense because we would have to speculate about what evidence the jury may have applied in its deliberations as to each individual count, especially in a case like this one, where the charges are interrelated and evidence relevant to one count may have influenced the jury as to others.

Next, the dissent suggests that this case should be remanded for an evidentiary hearing to determine the circumstances surrounding counsel's absence from the courtroom during the presentation of evidence against Roy.  Although Judge Boggs's dissent in *Green* (which reflects an almost identical yet condensed

25

version of the dissent that follows this opinion) made the same suggestion, the majority in *Green* "decline[d] the State's invitation to remand for an evidentiary hearing." 809 F.2d at 1261. The majority found that "[a]lthough it may be that some absences by a criminal defendant's attorney might be so *de minimis* that there would be no constitutional significance, the instant record unequivocally demonstrates that [Green's attorney's] absence was not *de minimis*. In our view, the record permits but one conclusion: [Green's] constitutional right to counsel was implicated by [Green's lawyer's] absence." *Id.* at 1261–62. Contrary to the dissent, we do not state a blanket rule requiring automatic reversal on the occasion of any absence of counsel from the courtroom during the presentation of evidence against the defendant at his trial. But here, the absence of Roy's counsel from the courtroom during the presentation of direct inculpatory testimony by a deputy sheriff who was the government's computer forensic specialist expert witness cannot reasonably be considered a *de minimis* constitutional violation.

In fact, Judge Boggs, the dissenter in *Green*, would seem to join the majority in this case. As Judge Boggs concedes, "[t]he facts of this case are a long way from, for an *extreme* example, taking of direct testimony against a single defendant whose counsel is absent." *Id.* at 1265 (Boggs, J., dissenting).

Our dissenting colleague next suggests that Roy's counsel "may have deliberately taken advantage of his own tardiness and carefully avoided any

26

attempt to correct the problem, hoping that he could have a get-out-of-jail-free card in his pocket for his client.  If so, it worked."[6]  Further, the dissent says that counsel may have "deliberately engineered the whole thing" and that our decision today could invite misconduct by opportunistic counsel, which, according to the dissent, is prevalent in the three states of the Eleventh Circuit as reflected by statistics evidencing rampant lawyer misconduct in Florida, Georgia, and Alabama by criminal lawyers.

Our confidence in the integrity of lawyers, who are admitted to practice in our courtrooms as officers of the Court bound by rules of professional responsibility, satisfies us that our decision today will not go so far as to motivate them to place their licenses to practice law in jeopardy by, as the dissent suggests, strategically slipping out of the courtroom when the judge is not looking and when they think inculpatory evidence is coming, to invite reversible error in the event of a conviction.  Nor does the parade of horribles imagined by the dissent permit us to disregard *Cronic*.

The dissent also maintains that judges are not like, in its words, "kindergarten teachers, [who] will be forced to keep an eye on their lawyer-children."  Contrary to that view, we are unpersuaded that United States District

---

[6] Counsel is so clever, says the dissent, that he may have deliberately arranged the services of another lawyer to argue this appeal rather than having to admit at oral argument that he orchestrated the entire *Cronic* violation.  The dissent infers too much to support such a conclusion.

Judges should be excused from the less than onerous burden of ensuring that the defendant's lawyer is seated at counsel table, next to his client, or is somewhere in the courtroom when the government seeks the admission of incriminating evidence that will be used by the jury to convict his client of a felony, resulting in life imprisonment. Especially in a trial with a single defendant who has a single lawyer.

We conclude that when the accused is deprived of his lawyer at a critical stage of his trial, there has been a denial of Sixth Amendment rights that makes the adversary process itself unreliable. The Constitution gives the defendant the right to "the guiding hand of counsel at every step in the proceedings against him." *Powell v. Alabama*, 287 U.S. 45, 69, 53 S. Ct. 55, 64 (1932). Accordingly, counsel's absence during the admission of inculpatory evidence against Roy at his trial is "'constitutional error of the first magnitude and *no amount of showing of want of prejudice would cure it*.'" *Cronic*, 466 U.S. at 659, 104 S. Ct. at 2047 (emphasis added) (quoting *Alaska*, 415 U.S. at 318, 94 S. Ct. at 1111).

Although we reverse and remand for a new trial, a reversal does not mean that the defendant goes free. Rather, Roy will be retried in accordance with the rules of evidence and procedure, and without constitutional error.

**IV.**

For the foregoing reasons, we reverse Roy's convictions and remand for a new trial.

**REVERSED and REMANDED.**

ED CARNES, Chief Judge, dissenting:

Returning late from a lunch break on the third day of a six-day trial, defense counsel missed a small part of the testimony of the twelfth of thirteen government witnesses. He was out of the courtroom for only seven of the 1,884 minutes, or 31.4 hours, of the trial (not counting recesses and jury deliberations), which amounts to less than one-half of one percent of the trial time. During his absence counsel missed only 18 answers out of a total of approximately 2,745 answers that were given by government witnesses during the trial, which means counsel missed less than one percent of the total number of answers given by witnesses for the prosecution. That's it. And all of the testimony that he missed was repeated in even more detail by the same witness after counsel returned to the courtroom.

So far as it appears from the record, the judge and the prosecutor did not notice defense counsel's brief absence. When he returned to the courtroom, counsel did not object to testimony having been taken in his absence. He did not ask the court to strike the questions and answers that he had missed and instruct the jury to disregard them. He apparently did not seek to have the questions and answers he missed read back to him outside the presence of the jury so that he could familiarize himself with them and object to any that were objectionable. For all that we can tell, counsel may have deliberately taken advantage of his own tardiness and carefully avoided any attempt to correct the problem, hoping that he

30

could have a get-out-of-jail-free card in his pocket for his client.  If so, it worked. The majority decides that the defendant's convictions for attempted child enticement and for possession of child pornography, most of which the defendant produced himself, must be set aside because of his counsel's brief absence, even though the record conclusively establishes that the absence could not possibly have prejudiced the defendant.

At oral argument, we could not ask the defendant's trial counsel about the facts surrounding his absence from the courtroom, why he did not object, if he made any off-the-record effort to familiarize himself with the testimony taken in his absence, or anything else about the matter.  The reason we could not ask what really happened, and why, is that trial counsel conveniently did not represent the defendant on appeal.  Another attorney did.  We could have remanded the case for an evidentiary hearing to find out all of the facts, but the majority refused my request to do that.  The majority is content with only a swift sideways glance at the facts because it thinks the facts can be presumed away.  But "[t]his is not a matter for polite [or impolite] presumptions; we must look the facts in the face."  Frank v. Mangum, 237 U.S. 309, 349 (1915) (Holmes, J., dissenting).

The majority's view, now the law of this circuit, is that if a witness gives any testimony at all, even a single answer, supporting any count against the defendant while the defendant's attorney is outside the courtroom, reversal of every count of

31

conviction is automatic. No matter what. Reversal is automatic regardless of the reason for the absence. Regardless of whether the trial judge or prosecutor noticed the absence. Regardless of whether the answer given during the absence was objectionable. Regardless of whether the defendant suffered any actual prejudice from counsel's absence. Regardless of whether counsel failed to object or seek any kind of corrective action. Regardless of whether counsel made a strategic decision not to seek to correct the problem. Regardless of whether the first mention of the matter was on appeal. And regardless of whether counsel deliberately engineered the whole thing. In other words, absence plus any inculpatory answer equals reversal regardless of any and all other facts and circumstances.

The majority holds that no matter how strong the evidence of the defendant's guilt, all a defense attorney has to do to guarantee an automatic reversal of his client's conviction on any and all counts is to be outside the courtroom while a witness gives a single inculpatory answer on any count against his client. The attorney can keep quiet about it until he sees what the verdict is and then claim his right to have any convictions set aside. And under today's decision they must be set aside.

In fact, under the majority's holding, it does not even matter if the attorney upon returning to the courtroom does object and does seek corrective action

32

because as soon as a single answer is given in his absence an absolute, conclusive, irrebutable presumption of prejudice arises.  Nothing can be done.  The law today's decision puts in place is that absence during any inculpatory testimony at all is all that matters; no prejudice is required, no inquiry is allowed, no cure is permitted.  Of course I dissent.

Because the facts do matter under a proper view of the law, Part I of this opinion summarizes the facts in order to show how defense counsel's brief absence could not possibly have prejudiced Roy on any count.  Part II explains why any claim of error concerning Roy's trial is not Cronic error, and why the majority's unprecedented decision to the contrary is an extreme outlier.  Part III addresses the far reaching effects of this decision.  Part IV lays out how we should have resolved this case.  It explains why any claim of error regarding defense counsel's momentary absence should be subject to the contemporaneous objection rule, and given the failure to object, should be reviewed only for plain error.  Applying that standard, each of Roy's five convictions should be affirmed because he cannot even come close to showing that his lawyer's seven-minute absence, which amounted to less than one-half of one percent of the trial's total length, prejudicially affected his substantial rights.  Part IV also points out that even if we put aside the failure to object and do not restrict our review to plain error, any error still would not be reversible because it was harmless.

## I.  The Facts of the Matter

The transcripts of Roy's trial show that, during its case-in-chief, the government questioned 13 witnesses who provided approximately 2,745 answers to questions while on the witness stand.  Defense counsel was out of the courtroom for only 18 of those answers and was present to hear 2,727 of them.  The 18 answers that he missed were given during a seven-minute period in a trial that lasted 31.4 hours, not counting recesses and jury deliberations.  To put it in context, defense counsel was out during less than one-half of one percent of the trial time; he was out during less than one percent of the testimony that was given by the government's thirteen witnesses.  Every answer given while counsel was absent was repeated by the same witness after counsel returned, and trial counsel objected to none of that testimony when it was reiterated in his presence.

To understand why defense counsel's brief absence did not prejudice Roy, it is important to consider the five charges against him.  Count 1 was different in kind from Counts 2 – 5.  Count 1 charged Roy with attempted child enticement, based on his efforts to arrange a sexual encounter with a fictitious 13-year-old girl in response to an internet ad posted by law enforcement.  That charge did not involve any child pornography.  And not a single question was asked about that charge during counsel's absence.

34

Counts 2 – 5 did involve child pornography.  Each of those four counts charged Roy with knowingly possessing "any visual depiction" of child pornography, and the same pornographic photographs and videos of minors were apparently used to prove each count.  The difference in the counts is based on the four different electronic devices Roy used to store those images:  his desktop computer (Count 2); his laptop computer (Count 3); his USB thumb drive (Count 4); and three of his CDs (Count 5).  The statutory basis for each of those four counts, 18 U.S.C. § 2252(a)(4)(B), (b)(2), required just one image, but the evidence proved without dispute that there were multiple pornographic photographs and videos of multiple minors on each of the four devices.  Each count was proven many times over.

## A.  The Testimony Presented During the First Two-and-a-Half Days of Trial Before Defense Counsel's Absence

During the first two days of the trial, with defense counsel present at all times, the government called ten witnesses who provided testimony focused almost exclusively on the attempted child enticement charge in Count 1.  That testimony showed that Roy, a middle school teacher, arranged a sexual encounter that he thought would involve a 13-year-old girl and her mother, and he drove to a pre-arranged location to meet them so that he could have sex with the girl.  The testimony also showed that Roy went to the liaison prepared — with condoms and

35

lubricant in his pockets.  Roy's lawyer was in the courtroom for the entirety of those first two days of trial and for the presentation of all of the testimony and evidence about Count 1.  He did not miss anything about Count 1 on those or any other days.  Yet the majority reverses that count of conviction anyway.

On the third day of trial, before the lunch break and in counsel's presence, there was some additional testimony about Count 1, including the fact that Roy had traveled more than an hour to get to the meeting place for the purpose of having sex with a 13-year-old girl.  Much of the testimony that morning, however, went to Counts 2 – 5 and concerned Roy's sexual relationship with L.B., the girl depicted in the pornographic images and videos that he had produced and stored on the four electronic devices specified in those four counts.  (As I have mentioned, there was also child pornography stored on each of those devices that depicted other minors, which Roy had downloaded from the internet.)

Also on the morning of the third day of trial, with defense counsel present, Florida Department of Law Enforcement Agent William Kulp testified without objection that L.B. was born on May 9, 1989.  That means any pornography depicting her that was produced before May 9, 2007 is child pornography.  See 18 U.S.C. § 2256(1) (defining "minor" for this purpose as anyone under 18 years of age).  The principal at the high school L.B. had attended identified photos of her in various school yearbooks, three of which were admitted into evidence without

36

objection.  The purpose of that testimony was to permit the jury to compare how L.B. looked at various ages with the depictions of her in the pornography.

The third and final witness to be called before the lunch break on the third day was Deputy Sheriff Charlie Longson, a computer forensics expert.  In defense counsel's presence, he testified extensively about his qualifications and how he forensically examines a computer.  He also testified about the user and email/messenger accounts he found on Roy's desktop computer which, among other things, was used to get into evidence Roy's email conversations setting up the sexual liaison with the 13 year old and the sexually oriented instant messenger conversations between Roy and L.B. that were on that computer.  Longson's testimony was interrupted by a lunch break.

Again, all of the testimony recounted so far occurred during the first two-and-a-half days of the trial, while Roy's counsel was continuously present in the courtroom.

## B.  The Testimony Presented During Defense Counsel's Brief Absence After Lunch on the Third Day of Trial

Defense counsel returned late from the lunch break on that third day and missed seven minutes of the testimony of Deputy Longson.  During the seven minutes counsel was out of the courtroom, Longson gave 18 answers to the prosecutor's questions.  All of those 18 answers concerned only six of the

37

numerous images of child pornography.  All six of those images were of L.B. and were found in only one of the several file folders containing child pornography on Roy's desktop computer.  That folder had been labeled "2006-03-11."  Longson testified that those six images depicted "a nude white female . . . bound to a table by her feet with rope" and with "an orange cloth . . . secured around her neck with silver duct tape."  He also testified that those six images were taken with a Kodak v530 Zoom Digital Camera on March 10, 2005, were initially uploaded onto a computer on March 11, 2006, and were then transferred to Roy's desktop computer on April 4, 2009.  All of that testimony was about facts that had been disclosed to the defense two months before trial in Longson's forensic lab report.  During the seven minutes while defense counsel was out, no exhibits were admitted into evidence and Longson did not identify L.B. as the female in the pornographic images.

## C.  The Testimony Presented After Defense Counsel's Return to the Courtroom Following His Brief Absence

Defense counsel returned to the courtroom following those seven minutes of testimony, which covered only three transcript pages.  The prosecutor then continued questioning Longson for 69 more pages of the transcript, he was cross-examined by defense counsel for 45 more pages, and his re-direct testimony covers 19 more pages.  Adding those numbers to Longson's 42 pages of testimony before

38

the lunch break, his testimony spans two days and covers 133 pages of the transcript, only three pages of which occurred in defense counsel's brief absence.

The testimony Longson gave during the seven minutes defense counsel was not there, all of which concerned only six of the multiple images of child pornography, was repeated immediately after counsel returned to the courtroom. After defense counsel entered the courtroom, the prosecutor approached Longson with 10 exhibits that included, among others, the six images Longson had found in the "2006-03-11" folder on Roy's desktop computer. Longson then described in detail what each image depicted, and testified that they had been created on March 11, 2006, and uploaded onto Roy's desktop computer on April 4, 2009. Those images showed the then-16-year-old L.B. "bound to a table by her feet with a . . . red and white ski rope"; she was wearing an "orange hood across her head with silver duct tape secured around the neck"; there was a "dildo inserted in her vagina" and "a male's penis . . . suspended above [her] body." (A few pages later in the transcript, Longson repeated his earlier testimony that all of the images of L.B. on Roy's desktop had been taken with a Kodak v530 Zoom Digital Camera.) At the time those images of L.B. were taken, she was a minor for purposes of the child pornography charges against Roy in Counts 2 – 5 because she was under 18 years of age. See 18 U.S.C. § 2256(1). The ten images were admitted into evidence without objection while defense counsel was present.

Being present during all of the testimony recounted in the preceding paragraph, Roy's trial counsel had an opportunity to object to the testimony or admission of the exhibits into evidence, but he did not object. Likewise, Roy's appellate counsel has not suggested any basis for objecting to the testimony or to the admission of the exhibits. Their failure to do so shows that trial counsel's seven-minute absence when the same testimony was given by the same witness earlier (and no exhibits were admitted) did not deprive the defense of an opportunity to lodge a valid objection to any testimony or evidence.

After repeating in defense counsel's presence all of the testimony he had missed, Longson testified for the first time about other pornographic images of L.B. that he had found on Roy's desktop, laptop, thumb drive, and CDs. None of those other images had been mentioned in counsel's absence. With counsel present, Longson described a series of three images found on Roy's desktop in a separate file folder labeled "2006-02-04," which featured L.B. lying naked in a bathtub with "Alex's Little Cunt" written in "black ink both on [her] chest between the breasts and then on [her] stomach over the naval." Longson testified that those images were taken on December 2, 2006, when L.B. indisputably would have been only 17 years old, which means she was a minor for purposes of the child pornography charges against Roy in Counts 2 – 5.

40

With defense counsel present, Longson also testified about finding on Roy's desktop and laptop numerous videos of L.B. that had been made between October and December 2006 using a Kodak v530 Zoom Digital Camera, and it was undisputed that L.B. would have been 17 years old during that time.  Some of those videos showed:  L.B. bound and blindfolded with a "body net covering her body" and "a red dildo inserted into her anus"; L.B. "fully nude" with a "dildo in her vagina" while she "perform[ed] fellatio on a white male"; L.B. "fully nude" with a "vibrator in her vagina" while a white male "attempt[ed] to have annal [sic] sex with her"; L.B. performing fellatio after removing a "school-girl outfit"; L.B. having sexual intercourse with a man while she was tied up; and L.B. lying "nude in [a] bathtub" with "Alex's little cunt" scrawled across her chest and stomach while a man urinated on her.

Longson described each of those videos and they were admitted into evidence.  Although defense counsel was present during all of that testimony and admission of exhibits, he never objected to any of it.  And Roy's appellate counsel has not suggested to us that there was any basis for objecting to that testimony or to the admission of those videos into evidence.

Longson's testimony about the child pornography he found on Roy's desktop, laptop, USB drive, and CDs was not limited to images and videos of L.B. Longson also testified about finding several images of downloaded child

41

pornography in temporary internet files on Roy's desktop computer, as well as pornographic images of minors stored elsewhere on his electronic devices, including files named "Kingpouge_14," "Vica_16," and "Svet_16." Longson specifically described how one of those images showed "two or three subjects under the age of 18 engaged in sexual activity with two men." These were images of minors other than L.B., and they were admitted into evidence. Although he was present during all of that testimony, defense counsel never objected to any of it, and Roy's appellate counsel has not suggested to us any ground for keeping it out.

The importance of the unrefuted testimony and evidence about the child pornography involving minors other than L.B., all of which was admitted while defense counsel was present, is that any one of those images was enough by itself to prove each of the charges contained in Counts 2 – 5, because all the statute requires is one "visual depiction" of child pornography. See 18 U.S.C. § 2252(a)(4). That means that even if all of the testimony involving L.B. were struck from the record because defense counsel was out of the courtroom while a small part of that testimony was first given, the Count 2 – 5 charges against Roy were still conclusively proven. They were conclusively proven by the testimony and other evidence concerning child pornography depicting minors other than L.B., all of which came in during counsel's presence.

42

Once the prosecution completed its direct examination of Longson, defense counsel thoroughly and vigorously cross-examined him over the course of 45 pages of the trial transcript. Counsel attempted to challenge Longson's testimony that the photographs and videos of L.B. were created when she was under the age of 18. His challenge fell short, however, because Longson explained that data embedded in the photographs and videos of L.B. showed that they had been taken with a Kodak digital camera on a date when L.B. was a minor. Significantly, defense counsel did not even attempt during cross-examination or elsewhere to challenge Longson's testimony about the pornographic images involving minors other than L.B., and any one of those images on the devices was enough to convict Roy on Counts 2 – 5.

On the fourth day of trial, the government called its last witness and then rested. The defense called a few witnesses, including Robert Deane Moody, its own computer forensics expert. He testified that there were reported problems with the battery life of the Kodak camera model that Roy had used to produce the images of L.B., which would cause the camera's internal clock to reset to its default date and time if the camera's battery went dead. If the internal clock in the camera used to create the images of L.B. had reset, it was possible that the creation dates that Deputy Longson had noted for the L.B. images and videos might be inaccurate. Moody conceded, however, that the problems were not necessarily

43

present in all of those models of the Kodak camera and that Roy's may not have

had any battery issues anyway.  He admitted that the names of the computer

folders in which the L.B. images were stored (i.e., "2006-03-11" and "2006-10-

13") were all consistent with the creation dates that the camera had embedded in

those images.  He also admitted that the images and videos were numbered

sequentially and showed no signs of reverting back to an earlier date.  And none of

his testimony concerned the numerous other images of child pornography that were

found on Roy's four electronic devices, any one of which was enough to prove his

guilt.

## II. Defense Counsel's Absence for Less Than One-Half of One Percent of the Trial Was Not <u>Cronic</u> Error

This part proceeds in four sections to explain why <u>Cronic</u>'s presumption of

prejudice does not apply in this case.  Section A reviews the <u>Cronic</u> decision and

related Supreme Court precedent and shows how trial counsel's seven-minute

absence during a six-day trial is far removed from the narrow and extreme

circumstances in which the <u>Cronic</u> presumption is appropriate.  Section B

discusses the meaning of a "critical stage," a meaning vital to consideration of

<u>Cronic</u> in this case, and explains how the majority's extreme definition of "stage"

runs counter to common sense and precedent.  Section C recognizes, as this Court

sitting en banc has held, that <u>Cronic</u>'s presumption is reserved for "only a very

narrow spectrum of cases" where the adversary process is presumptively unreliable, and it explains how the record plainly shows that there is nothing unreliable about Roy's trial and his convictions. Section D discusses decisions from other circuits that have addressed whether Cronic applies to temporary absences of an attorney from trial, and it shows that today's decision is an extreme outlier. It also discusses why courts are capable of determining whether brief attorney absences are prejudicial.

## A. Supreme Court Precedent

The majority's conclusion that defense counsel's seven-minute absence during a six-day trial requires a presumption of prejudice is unprecedented and wrong. Cronic carved out only a "narrow exception" to the general requirement that a defendant must affirmatively prove prejudice from an error involving counsel; the presumption of prejudice it created is limited to circumstances so grave that they amount to a total failure or complete deprivation of counsel. See Vines v. United States, 28 F.3d 1123, 1127 (11th Cir. 1994); see also United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 2047 (1984); Strickland v. Washington, 466 U.S. 668, 692, 104 S.Ct. 2052, 2067 (1984); Stano v. Dugger, 921 F.2d 1125, 1153 (11th Cir. 1991) (en banc) ("Cronic's presumption of prejudice applies to only a very narrow spectrum of cases where the circumstances leading to counsel's ineffectiveness are so egregious that the defendant was in

45

effect denied any meaningful assistance at all.") (quotation marks omitted) (emphasis added). Those circumstances include "the complete denial of counsel" at a "critical stage of [the] trial" and counsel's "entire[] fail[ure] to subject the prosecution's case to meaningful adversarial testing." Cronic, 466 U.S. at 659, 104 S.Ct. at 2047 (emphasis added).

For example, the Court in Cronic cited Hamilton v. Alabama, 368 U.S. 52, 82 S.Ct. 157 (1961), where prejudice was presumed when the defendant was entirely denied any counsel at his arraignment, and White v. Maryland, 373 U.S. 59, 83 S.Ct. 1050 (1963), where prejudice was presumed after the defendant was entirely denied counsel at a preliminary hearing. Cronic, 466 U.S. at 659, 104 S.Ct. at 2047. Here, by contrast, defense counsel was present during more than 99.5% of Roy's trial, which can hardly be characterized as the "complete denial of counsel" at a critical stage or an "entire[] fail[ure] to subject the prosecution's case to meaningful adversarial testing." See id. Counsel vigorously represented Roy. Among other things, he cross-examined Deputy Longson for 45 pages of the trial transcript and called his own competing expert witness to undermine Longson's testimony.

Given the "very narrow spectrum of cases" to which the Cronic exception to the actual prejudice requirement applies, we have held en banc that the burden of establishing that an error warrants Cronic's presumption of prejudice is "a very

46

heavy one." <u>Stano</u>, 921 F.2d at 1153 (quotation marks omitted).  Both the difficulty of carrying that "very heavy" burden and the "very narrow" scope of the <u>Cronic</u> exception are evident from the fact that the Supreme Court has repeatedly refused to apply it.  For example, the Court has held that the <u>Cronic</u> exception did not apply, and the usual showing of actual prejudice was required, where trial counsel failed to present any mitigating evidence or any final argument during the penalty phase of a capital trial.  <u>Bell v. Cone</u>, 535 U.S. 685, 692–98, 122 S.Ct. 1843, 1849–52 (2002).  The Court also has held that <u>Cronic</u> did not apply, and a showing of actual prejudice was required, where trial counsel without the defendant's consent conceded that the defendant was guilty of capital murder. <u>Florida v. Nixon</u>, 543 U.S. 175, 178, 190–91, 125 S.Ct. 551, 555, 562–63 (2004). Not once in the thirty years since the <u>Cronic</u> decision was issued has the Supreme Court ever found that its presumptive prejudice rule applied.  The scope of the rule is that narrow; the burden of showing that it applies is that heavy.

Even in the <u>Cronic</u> case itself, the Court did not find that the <u>Cronic</u> exception applied.  That case involved a woefully inexperienced, young attorney who had been appointed counsel in a complex mail fraud case only 25 days before trial, a case that the government had investigated for over four-and-a-half years during which it reviewed thousands of documents.  <u>Cronic</u>, 466 U.S. at 649, 662– 66, 104 S.Ct. at 2041, 2049–51.  Despite those extreme facts, the Court refused to

47

presume prejudice, requiring instead that the defendant show that he actually was prejudiced. The Supreme Court's insistence on confining the Cronic exception to narrow boundaries is evident from the fact that in Bell, Nixon, and Cronic itself the Court reversed the decisions of lower courts that had presumed prejudice. See Nixon, 543 U.S. at 189–93, 125 S.Ct. at 561–63; Bell, 535 U.S. at 688, 702, 122 S.Ct. at 1847, 1854; Cronic, 466 U.S. at 666–67, 104 S.Ct. at 2051. And in all of those cases, the risk of prejudice to the defendant was much greater than the risk of prejudice to Roy from his lawyer's seven-minute absence during a six-day trial.

The opinions in Cronic and Strickland indicate that Cronic's narrow exception to the requirement that actual prejudice be shown rests in large part on considerations of judicial economy applicable only to rare circumstances. See Cronic, 466 U.S. at 658, 104 S.Ct. at 2046 ("There are, however, circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified.") (emphasis added); Strickland, 466 U.S. at 692, 104 S.Ct. at 2067 ("Prejudice in these [Cronic] circumstances is so likely that case-by-case inquiry into prejudice is not worth the cost.") (emphasis added). The rare circumstances are those in which the likelihood of prejudice is so high that there is no point in wasting time looking into it. This case does not involve one of those rare circumstances any more than the Bell, Nixon, and Cronic cases did.

## B.  A Single Inculpatory Question and Answer Does Not Qualify as a "Stage" of a Trial

48

The majority's strategy for escaping the narrow confines of <u>Cronic</u>, a decision which presumes prejudice only when defense counsel is absent or not functioning as counsel for an entire stage of a criminal trial, is to fragment the meaning of "stage" so that any and every inculpatory answer, or any eighteen out of 2,745 of them in this case, is a separate stage of the case. While that extraordinary view serves the purpose of converting <u>Cronic</u>'s "very narrow" exception into a very broad one, it is indefensible. Under the majority's view the trial is not a stage of the case, it is instead a collection of hundreds or thousands of stages depending on its length. Every time a witness, whether a government witness on direct examination or a defense witness on cross-examination, provides an inculpatory answer, a separate stage of the trial has occurred, according to the majority. That means, in this case with 2,745 answers from witnesses for the government, the presentation of the government's case was not a stage of the case but instead was more than two thousand stages of the case. <u>See</u> Maj. Opn. at 11–13. That is the only way the majority can conclude that because Roy's counsel missed 18 answers out of 2,745 that government witnesses gave, he was absent during a critical "stage" of the trial, or actually during eighteen critical stages.

The majority's definition distorts the common meaning of the word "stage." <u>See</u> <u>Random House Webster's Unabridged Dictionary</u> 1853 (2d ed. 2001) (defining "stage" as "a particular phase, period, position, etc., in a process,

49

development, or series"). When we use the word "stage" in our everyday life, and throughout the law, we do not mean to refer to fleeting moments or small slices of events. Instead, we use the word to refer to larger component parts of a process that share a common characteristic. For example, adolescence is considered a stage of life; but we would never speak of every minute, hour, or day of an adolescent's life as a stage of his life. But that is what the majority is doing in this case. A stage is not a stage, in its view, but instead is every small part of every single component of all the phases of a stage. That does not make sense.

Distorting the definition of "stage" eviscerates Cronic's requirement that there be "a complete denial of counsel" "at a critical stage of his trial" before a presumption of prejudice applies. Cronic, 466 U.S at 659, 104 S.Ct. at 2047. Denial of counsel during less than one-half of one percent of a trial, for only seven minutes of a 31.4 hour-long trial, can hardly be called a "complete denial of counsel" during "a critical stage" of the trial. If that is "a complete denial of counsel" during a critical stage, what would a partial denial of counsel look like? What would denial of counsel for less than an entire stage of a trial be?

Only by shrinking "critical stage of [the defendant's] trial" to an indefensibly tiny fraction of what it means can the majority reach the result it does in today's decision. If we defined the stage to be the prosecution's case-in-chief, there would not be a complete denial of counsel because Roy's attorney was absent

50

for only a small sliver of the government's case.  If we defined the stage to be the testimony of any of the government's 13 witnesses, there would not be a complete denial of counsel because Roy's attorney missed only a few answers of the testimony of one of those witnesses.  Even if we fragmented "stage" down to the direct examination of any of the government's 13 witnesses, there would still not be a complete denial of counsel because Roy's attorney was present during the vast majority of Deputy Longson's direct examination.

The majority's redefinition of the word "stage" finds no support in the Supreme Court decisions in this area.  Instead, the Supreme Court's decisions show that it understands "stage," as it used the term in Cronic, to mean a broader, qualitatively distinct phase of a criminal proceeding, such as a post-indictment lineup or interrogation, an arraignment, a plea or other pretrial hearing, closing arguments as a whole, and sentencing.  See Missouri v. Frye, — U.S. —, 132 S.Ct. 1399, 1407 (2012) (plea negotiations as a critical stage); Montejo v. Louisiana, 556 U.S. 778, 786, 129 S.Ct. 2079, 2085 (2009) (post-indictment interrogation as a critical stage); Iowa v. Tovar, 541 U.S. 77, 87, 124 S.Ct. 1379, 1387 (2004) ("A plea hearing qualifies as a critical stage.") (quotation marks omitted); Bell, 535 U.S. at 695–96, 122 S.Ct. at 1851 (noting that a "critical stage" denotes "a step of a criminal proceeding, such as arraignment") (emphasis added); Gardner v. Florida, 430 U.S. 349, 358, 97 S.Ct. 1197, 1205 (1977) (sentencing as a critical stage);

51

Herring v. New York, 422 U.S. 853, 863, 95 S.Ct. 2550, 2555 (1975) (invalidating a statute that allowed a trial judge "to deny absolutely the opportunity for any closing summation at all"); Kirby v. Illinois, 406 U.S. 682, 683, 92 S.Ct. 1877, 1879 (1972) (post-indictment lineup as a critical stage); Hamilton, 368 U.S. at 54–55, 82 S.Ct. at 158–59 (complete absence of counsel from the defendant's arraignment); White, 373 U.S. at 59-60, 83 S.Ct. at 1051 (complete absence of counsel from a preliminary hearing).

The Supreme Court has never suggested for a moment that a single inculpatory question and answer, or a handful of them, is an independent or separate "stage" of a criminal proceeding, nor has it ever suggested that a critical stage can, or should, be subdivided into countless sub-stages. For example, in Gilbert v. California, 388 U.S. 263, 267, 87 S.Ct. 1951, 1953 (1967), the Supreme Court analyzed whether the whole process of taking handwriting exemplars qualified as a critical stage, not whether each stroke of the defendant's pen was its own distinct stage. And in United States v. Wade, 388 U.S. 218, 236–37, 87 S.Ct. 1926, 1937 (1967), the Court decided whether a post-indictment lineup, considered as a whole, was a critical stage of criminal proceedings, not whether each glance of the witness at the defendant or other moment was itself a stage.

Today's decision is the first time that an appellate court has subdivided a stage of criminal proceedings into hundreds or thousands of smaller stages and

52

called them all critical. See, e.g., United States v. Ross, 703 F.3d 856, 873–74 (6th Cir. 2012) (analyzing whether a competency hearing qualified as a critical stage); McNeal v. Adams, 623 F.3d 1283, 1289 (9th Cir. 2010) (holding that a hearing on a motion to compel the defendant to provide a DNA sample was not a critical stage after considering several factors that might "make a proceeding a critical stage") (emphasis added); McDowell v. Kingston, 497 F.3d 757, 762–63 (7th Cir. 2007) (discussing whether the complete testimony of a defendant constituted a critical stage of his trial); Harrington v. Gillis, 456 F.3d 118, 132 (3d Cir. 2006) (noting that "an appeal is a critical stage of criminal proceedings") (emphasis added); United States v. Sanchez-Barreto, 93 F.3d 17, 20 (1st Cir. 1996) (noting that a "plea withdrawal hearing" was a critical stage) (emphasis added); United States v. Branch, 91 F.3d 699, 723 (5th Cir. 1996) (analyzing whether a pre-verdict bench conference was a critical stage of the criminal proceedings); United States v. Hicks, 948 F.2d 877, 885 (4th Cir. 1991) (analyzing whether "a routine presentence interview" qualified as a critical stage of the criminal proceedings) (emphasis added); United States v. Sayeedi, 903 F.2d 88, 91 (2d Cir. 1990) (noting that jury selection is a critical stage and not analyzing whether every question asked and answer given during voir dire qualified as an independent critical stage).

Even the decision that the majority relies on for its "working definition" of a critical stage did not define "stage" the way the majority does. See Van v. Jones,

53

475 F.3d 292 (6th Cir. 2007).  In Van, the Sixth Circuit addressed whether a "consolidation hearing" qualified as a critical stage of the proceedings against the defendant.  Id. at 293.  The question, as the court framed it, was not whether seven minutes of that hearing amounted to a "critical stage."  Nor was the question whether a single statement made during the hearing was a "critical stage."  Instead, the question in the Sixth Circuit's view was whether the entire hearing, which Van's attorney had missed, was a critical stage.

The majority also relies on the Fifth Circuit's en banc decision in Burdine v. Johnson for its definition of a critical stage, but in that decision the Fifth Circuit emphasized that "stages" are broader proceedings.  262 F.3d 336, 347 (5th Cir. 2001) ("To justify a particular stage as critical, the Court has not required the defendant to explain how having counsel would have altered the outcome of his specific case.  Rather, the Court has looked to whether the substantial rights of a defendant may be affected during that type of proceeding.") (quotation marks omitted) (emphasis added).  There is no support in either the decisions of the Supreme Court or of other federal appellate courts for the majority's extraordinary definition of a stage of a criminal proceeding for Cronic critical stage purposes.

## C.  The Adversary Process of Roy's Trial Was Not Unreliable and Roy Did Not Suffer Prejudice

As the Supreme Court has explained, Cronic's rarely applicable presumption is reserved for Sixth Amendment violations that are so serious that they "make[]

the adversary process itself presumptively unreliable." Cronic, 466 U.S. at 659, 104 S.Ct. at 2047; see also Hammonds v. Newsome, 816 F.2d 611, 613 (11th Cir. 1987) ("This Court has stated that the presumptive prejudice approach of the Cronic dictum applies to a narrow range of cases where there is a fundamental breakdown of the adversarial process.") (quotation marks omitted); Chadwick v. Green, 740 F.2d 897, 900 (11th Cir. 1984) ("Circumstances which would warrant a presumption of prejudice . . . are those where 'the adversary process itself is [rendered] presumptively unreliable [by the circumstances].'") (alterations in original) (footnote omitted); United States v. Russell, 205 F.3d 768, 771 (5th Cir. 2000).  The trial record in this case makes it abundantly clear that the adversary process leading to Roy's convictions on each of the five counts against him was not unreliable, much less presumptively so.  Roy suffered no prejudice on any count because of his attorney's seven-minute absence from the 1,884-minute trial, and the majority's conjecture that the testimony presented during counsel's brief absence "contributed to [Roy's] conviction," Maj. Opn. at 1, ignores the evidence in the record.

The majority's refusal to take a hard look at whether there was a real possibility of actual prejudice also runs counter to the nature of a critical stage.  As the Seventh Circuit has explained, whether part of a criminal prosecution is a critical stage "depends itself to some degree on a prejudice analysis."  United

55

States v. Morrison, 946 F.2d 484, 503 n.5 (7th Cir. 1991) ("We note that despite Cronic's insistence on a presumption of prejudice in certain cases, the definition of a prosecution[]'s critical stage—and hence the determination of whether a prejudice presumption applies—depends itself to some degree on a prejudice analysis.  Even when engaging in a Cronic inquiry, then, we are never completely loosed from the factual moorings of the case before us.  The notion that Cronic and its progeny completely obviate the need for any inquiry into the potential for prejudice is thus not entirely accurate.").  To borrow the Seventh Circuit's apt words, the analysis in the majority opinion is "completely loosed from the factual moorings of the case before us."

As I have pointed out, all of the evidence of Roy's guilt on Count 1, the attempted child enticement charge, was presented while defense counsel was present.  He did not miss any of it.  The brief testimony that did occur while counsel was momentarily out of the courtroom went only to Counts 2 – 5; those four counts involved conduct that was not even discovered by the police until after Roy was arrested on the attempted child enticement charge and his house was searched.  The charges in Counts 2 – 5 were separate from and independent of the Count 1 charge.  See supra Part I.

Roy's defense theory on Count 1 was that the police had entrapped him in the reverse sting operation.  He asserted in closing argument that it had been the

56

police who were "doing the enticing."  The majority believes that the six images of L.B. that were partially discussed while defense counsel was absent were relevant to Roy's entrapment defense to Count 1 because the government argued in closing argument that all of the images, including the ones discussed during counsel's absence, showed Roy's proclivity for having sex with underage girls.  See Maj. Opn. at 22–23.  There are two reasons why that prejudice theory is unconvincing. One reason is that those same six images were discussed in much greater detail and length after counsel returned to the courtroom and, in fact, the six images were admitted into evidence (without objection) only after counsel returned.  Anything that the initial testimony about those six images showed about Roy's proclivity was also shown through the testimony taken and the images that were admitted into evidence while counsel was there.

The other reason this possibility of prejudice through proclivity theory is unconvincing is that those six images of L.B. were only a small fraction of the total number of hardcore photographic and video images of her that were discussed and admitted into evidence.  The vast majority of the testimony about those six images of L.B. and all of the testimony about the numerous other pornographic images of L.B. took place after counsel returned to the courtroom.  Counsel had the opportunity to cross-examine the witness, and he did cross-examine him for 45 pages of the trial transcript.

57

Not only that, but there were also numerous pornographic images of other minor females found on Roy's electronic devices. Every bit of the testimony about all of that non-L.B. child pornography came in while defense counsel was present. And every one of the images of child pornography — of L.B. and of other minors — was admitted into evidence without objection while defense counsel was present. Roy's proclivity was overwhelmingly proven by testimony given and evidence admitted in the presence of his counsel.

When the government argued against Roy's entrapment defense at closing, it did not tell the jury to consider only the six images that Deputy Longson had mentioned while defense counsel was absent. Instead it asked the jury to consider all of the images and videos, stating: "He was predisposed. You know that from all of these videos and pictures he likes to watch." There is no doubt, and no reason to doubt, that the adversarial process leading to Roy's conviction on the Count 1 charge was reliable, and he was not prejudiced by his attorney's seven-minute absence during which that charge did not even come up.[1]

---

[1] The majority claims that I contend that Roy's conviction and sentence on Count 1 should stand "even if counsel's absence taints the conviction as to Counts 2–5" because "we can separate out the evidence as to each count." Maj. Opn. at 23. Just to be clear, my position is that counsel's absence did not taint any of Roy's convictions, including the convictions on Counts 2–5. Period. And the very fact that we can easily separate out the evidence as to each count in this case is a persuasive indication that the error in Roy's trial was not Cronic error. Because there was no Cronic error, there is no presumption of prejudice.

58

There is also no question that the adversarial process leading to Roy's convictions on Counts 2 – 5 was reliable. Again, those counts were organized by different devices — a desktop computer, a laptop computer, a USB thumb drive, and three CDs — that were found in Roy's home and all of which contained child pornography. To convict him on Counts 2 – 5, the jury had to find only that he possessed the named device and that he knew it contained at least one image of child pornography. Roy has never denied possessing each of those devices, nor has he ever denied that there was child pornography on them.

Roy's defense theory was that all of the L.B. images were taken after her eighteenth birthday. The evidence overwhelmingly disproved that theory, but even if the jury had somehow accepted it, even if we totally disregard not just the six images of L.B. that were discussed in counsel's absence but all of the L.B. images, the other child pornography on Roy's various electronic devices establishes his guilt of the charges contained in Counts 2 – 5. And none of that other child pornography was discussed, mentioned, or even alluded to during the seven minutes while defense counsel was outside the courtroom. All of the evidence about that other child pornography came in without objection during the 1,877 minutes, or more than 31 hours, that counsel was present and fully participating in the trial. Because of that evidence, Roy would have been just as guilty of the

59

Count 2 – 5 charges if the pornographic images and videos of L.B. had never been mentioned, never been discovered, never existed.

The majority seeks to render irrelevant the fact that Roy could not possibly have suffered prejudice on any count of conviction by simply labeling counsel's absence a "structural error" that precludes any examination of how the evidence related to each count.[2]  Maj. Opn. at 24–25.  Its circular reasoning is that defense counsel's temporary absence was a Cronic error and all Cronic errors are structural errors, therefore the temporary absence was structural error.  Maj. Opn. at 17–18.  I do not dispute that Cronic errors are structural errors, or at least akin to them, because they require automatic reversal without any inquiry into the existence of actual prejudice.  See United States v. Arbolaez, 450 F.3d 1283, 1295 (11th Cir. 2006) (explaining that the "constructive denial of counsel is legally presumed to result in prejudice and thus to constitute a structural error") (quotation marks omitted).  But calling Cronic errors structural errors does not add anything to the majority's analysis.  Instead, it simply assumes the conclusion that the temporary absence was Cronic error.

---

[2] The majority asserts that looking into whether there was prejudice as to each count "makes little sense because we would have to speculate about what evidence the jury may have applied in its deliberations as to each individual count."  Maj. Opn. at 25.  The majority appears to disregard the fact that every inquiry into prejudice is inherently speculative, yet courts do it all the time.  Cf. Sears v. Upton, — U.S. —, 130 S.Ct. 3259, 3266 (2010) (observing that Strickland's prejudice inquiry "will necessarily require a court to speculate") (quotation marks omitted).

If defense counsel's temporary absence were a Cronic error, it would necessarily follow that it was a structural error, which is a type of error that, by definition, "affect[s] the framework within which the trial proceeds" and prevents the trial from "reliably serv[ing] its function as a vehicle for determination of guilt or innocence." Arizona v. Fulminante, 499 U.S. 279, 310, 111 S.Ct. 1246, 1265 (1991) (emphasis added). As the facts of this case and the previous discussion show, defense counsel's brief absence did not prevent him from vigorously defending Roy, did not affect the entire framework of Roy's trial, and did not undermine the reliability of the trial as a mechanism for determining Roy's guilt or innocence. The seven-minute absence during a trial that lasted more than 31 hours was not a structural error.

The majority attempts to bolster its "structural error" conclusion by asserting that structural errors are ones in which a reviewing court can only speculate as to their effect. Maj. Opn. at 22–23. That view won't work because, as the Supreme Court has pointed out, any and every inquiry into prejudice is necessarily speculative. See Sears, 130 S.Ct. at 3266 (observing that Strickland's prejudice inquiry "will necessarily require a court to speculate"). An error is not transformed into structural error simply because in determining whether it had prejudicial effect a reviewing court must engage in speculation. If it were, every error would be structural error mandating reversal; there would be no harmless error review.

61

Yet the harmless error doctrine is alive and well.  And as the Supreme Court has repeatedly held, the majority of constitutional errors that occur at a criminal trial may be examined for prejudicial effect and do not require reversal if they are harmless.  In Fulminante, the Court listed a dozen and a half of its decisions establishing this point, which refutes the majority's position:

> Since this Court's landmark decision in Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless. See, e.g., Clemons v. Mississippi, 494 U.S. 738, 752–754, 110 S.Ct. 1441, 1450–1451, 108 L.Ed.2d 725 (1990) (unconstitutionally overbroad jury instructions at the sentencing stage of a capital case); Satterwhite v. Texas, 486 U.S. 249, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (admission of evidence at the sentencing stage of a capital case in violation of the Sixth Amendment Counsel Clause); Carella v. California, 491 U.S. 263, 266, 109 S.Ct. 2419, 2421, 105 L.Ed.2d 218 (1989) (jury instruction containing an erroneous conclusive presumption); Pope v. Illinois, 481 U.S. 497, 501–504, 107 S.Ct. 1918, 1921–1923, 95 L.Ed.2d 439 (1987) (jury instruction misstating an element of the offense); Rose v. Clark, 478 U.S. 570, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986) (jury instruction containing an erroneous rebuttable presumption); Crane v. Kentucky, 476 U.S. 683, 691, 106 S.Ct. 2142, 2147, 90 L.Ed.2d 636 (1986) (erroneous exclusion of defendant's testimony regarding the circumstances of his confession); Delaware v. Van Arsdall, 475 U.S. 673, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986) (restriction on a defendant's right to cross-examine a witness for bias in violation of the Sixth Amendment Confrontation Clause); Rushen v. Spain, 464 U.S. 114, 117–118, and n. 2, 104 S.Ct. 453, 454–455, and n. 2, 78 L.Ed.2d 267 (1983) (denial of a defendant's right to be present at trial); United States v. Hasting, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983) (improper comment on defendant's silence at trial, in violation of the Fifth Amendment Self–Incrimination Clause); Hopper v. Evans, 456 U.S. 605, 102 S.Ct. 2049, 72 L.Ed.2d 367

(1982) (statute improperly forbidding trial court's giving a jury instruction on a lesser included offense in a capital case in violation of the Due Process Clause); Kentucky v. Whorton, 441 U.S. 786, 99 S.Ct. 2088, 60 L.Ed.2d 640 (1979) (failure to instruct the jury on the presumption of innocence); Moore v. Illinois, 434 U.S. 220, 232, 98 S.Ct. 458, 466, 54 L.Ed.2d 424 (1977) (admission of identification evidence in violation of the Sixth Amendment Counsel Clause); Brown v. United States, 411 U.S. 223, 231–232, 93 S.Ct. 1565, 1570–1571, 36 L.Ed.2d 208 (1973) (admission of the out-of-court statement of a nontestifying codefendant in violation of the Sixth Amendment Counsel Clause); Milton v. Wainwright, 407 U.S. 371, 92 S.Ct. 2174, 33 L.Ed.2d 1 (1972) (confession obtained in violation of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964)); Chambers v. Maroney, 399 U.S. 42, 52–53, 90 S.Ct. 1975, 1981–1982, 26 L.Ed.2d 419 (1970) (admission of evidence obtained in violation of the Fourth Amendment); Coleman v. Alabama, 399 U.S. 1, 10–11, 90 S.Ct. 1999, 2003–2004, 26 L.Ed.2d 387 (1970) (denial of counsel at a preliminary hearing in violation of the Sixth Amendment Confrontation Clause).

499 U.S. at 306–07, 111 S.Ct. at 1263–64. By insisting that a structural error exists whenever a reviewing court cannot know for certain what effect, if any, the error had, the majority expands the category of structural errors to include most or all errors despite the Supreme Court's recent reminder that only a "very limited class of errors" qualifies as structural error. United States v. Davila, — U.S. —, 133 S.Ct. 2139, 2149 (2013).

The Supreme Court's decision in Fulminante illustrates why defense counsel's brief absence in this case was not a structural error. In that case the Supreme Court held that the improper admission of a coerced confession was subject to harmless error review even though "confessions have [a] profound

63

impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so." Fulminante, 499 U.S. at 296, 111 S.Ct. at 1257 (quotation marks omitted).  If the erroneous admission of a confession, which may have had a "profound impact on the jury" is not structural error, then neither is the erroneous admission of inculpatory evidence presented during counsel's brief absence.  That is particularly true where that inculpatory evidence is repeated in counsel's presence along with other overwhelming evidence of guilt.

### D.  The Majority's Decision Is an Outlier and the Reasons It Gives for Presuming Prejudice Are Not Persuasive

In its effort to persuade us that the complete absence of prejudice should not matter, the majority puts forward some decisions from our sister circuits.  It also gives several reasons why it believes that Cronic's presumption of prejudice should apply when defense counsel misses the presentation of any inculpatory evidence, even a single question and answer.  That effort to persuade fails.

### 1.  The Decisions of Other Circuits

Today's decision makes us the only court of appeals to hold that any attorney absence during the presentation of any directly inculpatory evidence, even a single question and answer, is "so likely to prejudice the accused that the cost of litigating [its] effect in a particular case is unjustified." Cronic, 466 U.S. at 658, 104 S.Ct. at 2046.  This decision is an outlier that puts us way out there.

64

The majority asserts that "no Circuit has applied harmless error review upon a finding that a defendant was deprived of his lawyer during the presentation of inculpatory testimony to the jury." Maj. Opn. at 19. That is somewhat misleading because it implies that all circuits have treated attorney absences as Cronic errors, which they have not.[3] In United States v. Kaid, for example, the Second Circuit was asked to apply Cronic's presumption to a factual scenario remarkably similar to the one in this case, and it refused to do so. 502 F.3d 43 (2d Cir. 2007). In Kaid several codefendants were convicted of conspiring to commit money laundering and trafficking in contraband cigarettes. Id. at 45. Defense counsel for one of those codefendants, Azzeaz Saleh, missed 20 minutes of his client's trial because he misunderstood when the judge planned to continue the trial after a lunch break. Id. at 44–45. During defense counsel's absence, the government presented evidence that was highly inculpatory of Saleh. The government showed video footage of Saleh and other codefendants purchasing the contraband cigarettes that were in issue at the trial, and it called a witness to the stand who testified "at nine

---

[3] Actually, that is not the only part of that sentence from the majority opinion that is wrong. The first clause of the sentence says: "Despite other Circuits' willingness to apply harmless error review to Cronic error generally . . . ." Maj. Opn. at 19. No circuit has been willing to apply harmless error review to a Cronic error, nor should one. As I have explained, if there is Cronic error, no prejudice need be shown. The majority cites Siverson v. O'Leary, 764 F.2d 1208, 1217–19 (7th Cir. 1985), as an example of a decision applying the harmless error rule to Cronic error, but the Seventh Circuit did not find Cronic error in that case. Instead, it found that the absence of counsel during jury deliberations, including when the judge questioned the jury about whether it had reached a verdict, and counsel's absence during the return of the verdict was not Cronic error and was harmless. Id. at 1217–21.

separate points that the video showed Saleh." Id. at 45. On appeal Saleh argued that he was entitled to a presumption of prejudice because his attorney had been absent during a critical stage of the trial, id. at 46, but the Second Circuit unequivocally rejected that argument and applied Strickland to Saleh's ineffective assistance claim. Id. at 46–47. The Kaid court affirmed Saleh's convictions after concluding that he had not suffered prejudice from his counsel's 20-minute absence because (1) counsel had been able to challenge the admissibility of the identification testimony the day before he was absent from the courtroom, and (2) after he returned to the courtroom counsel had been able to cross-examine the witness who had repeatedly identified Saleh in the video. Id. at 47. The circumstances in our case are even stronger for affirmance than those in Kaid, because there is no indication in the Kaid opinion that the evidence counsel missed was repeated after he returned to the courtroom; here, we know it was. The Kaid decision is correct, and it is important.

The majority attempts to distinguish Kaid, by arguing that the Second Circuit's decision "has nothing to do with Cronic" because the defendant in Kaid raised an ineffective assistance of counsel claim and the court analyzed the claim in that case under Strickland. See Maj. Opn. at 19. The majority's argument ignores the fact that Cronic concerned ineffective assistance of counsel claims, and that its sole function is to serve as a rare exception to the requirement that a

66

defendant show prejudice from an error relating to counsel.  See Cronic, 466 U.S. at 666, 104 S.Ct. at 2051 (concluding that "[t]his case is not one in which the surrounding circumstances make it unlikely that the defendant could have received the effective assistance of counsel") (emphasis added).  Indeed, the very issue presented to the Second Circuit by the argument of the petitioner in that case was whether Cronic's presumption of per se prejudice applied, or instead the petitioner had to show prejudice.  See Kaid, 502 F.3d at 46 ("Saleh argues, however, that the above mentioned Strickland requirements, particularly the prejudice prong, are not necessary because his counsel's absence constituted per se ineffective assistance.").  The petitioner in Kaid argued that Cronic meant he did not have to show prejudice.  See Brief for Defendant-Appellant Azzeaz Saleh at 9, Kaid, 502 F.3d 43 (No. 05-4470-cr), 2006 WL 5309723 (citing Cronic in support of Saleh's argument that he was entitled to a presumption of prejudice).  The Second Circuit rejected Saleh's Cronic contention and held that he had to show that his attorney's absence from trial prejudiced him.  And it held that he failed to do so, even though his counsel missed the presentation of twenty minutes of inculpatory testimony (as compared to seven minutes in this case).  The majority concedes that "the Second Circuit worked under Strickland's framework, not Cronic's," Maj. Opn. at 19, but it fails to recognize what that means, which is that the Second Circuit rejected the

67

argument that Cronic should apply to a brief absence of counsel from trial during the presentation of inculpatory testimony.

Although the majority cites various decisions from other circuit courts of appeals in support of its claim that Cronic applies when counsel is absent during the presentation of any inculpatory evidence, all of those decisions are distinguishable from the present case. The circuits that have applied Cronic's presumption to attorney trial absences have done so only when those absences were substantial. In Russell, for example, the Fifth Circuit applied Cronic when counsel missed two entire days of trial. 205 F.3d at 669–71. That case did not involve an absence of only seven minutes of a six-day trial, and it did not involve a situation where all of the questions and answers that counsel missed were repeated after he returned to the courtroom. The Fifth Circuit also applied Cronic to a constructive attorney absence when defense counsel was "repeatedly unconscious through not insubstantial portions of the defendant's capital murder trial," having "repeatedly dozed and/or actually slept during substantial portions of [the] capital murder trial." Burdine, 262 F.3d at 340–41. Seven minutes is not a substantial portion of a six-day trial. And, in any event, there is no indication in the Burdine opinion that the testimony defense counsel missed while unconscious was repeated in full after he returned to a state of consciousness.

68

The Sixth Circuit applied the Cronic presumption in a case where defense

counsel missed at least 100 minutes of trial.[4]  See Green v. Arn, 809 F.2d 1257,

1260–61 (6th Cir. 1987), vacated on other grounds, 484 U.S. 806, 108 S.Ct. 52

(1987), reinstated, 839 F.2d 300 (1988).  But a hundred minutes is not seven

minutes, and the Green court acknowledged that "some absences by a criminal

_____

[4] Although the majority points out that there may be some ambiguity in the Green opinion concerning the length of defense counsel's absence, see Majority Opn. at 14 n.2, portions of the transcript quoted in the Green decision indicate that the absence was not brief. See Green, 809 F.2d at 1260–61 (noting that defense counsel for Green's codefendants had begun cross-examining a witness at 2 pm and by 3:40 pm the defendant's trial counsel still had not returned to the courtroom).  The majority also fails to acknowledge that Green alleged that her attorney had been absent during other portions of the criminal proceedings against her, including an entire hearing on a suppression motion, the government's closing arguments at trial, and when the jury asked the court questions during its deliberations. Id. at 1259 n.1.  Nothing like that happened in this case.

Even though defense counsel in Green missed far more of the trial than Roy's counsel missed in this case, the decision to presume prejudice was ardently attacked by a dissenting judge in that case.  Judge Boggs recognized that the majority's decision in Green went well beyond Cronic, created perverse incentives for defense attorneys, and unduly burdened trial judges.  He noted that Cronic applied where there was a "complete denial of counsel" at a critical stage, and that a presumption of prejudice was warranted only when there was a denial of counsel that was "complete in terms of the process of truth-seeking." Id. at 1264 (Boggs, J., dissenting) (quotation marks omitted).  He argued that there was no complete denial of counsel in Green because of "the episodic nature of the absence." Id. at 1265.

The majority argues that "Judge Boggs, the dissenter in Green, would seem to join the majority in this case." Maj. Opn. at 26.  That is a mistaken view of his position, as this excerpt from his dissenting opinion in that case makes clear:

> Here, there is no hint or even speculation that what went into the record or into the ears of the jury would have differed if the error had not occurred.  Nor is this an instance where counsel's presence to object or take a strategic decision could have been crucial, nor where an opportunity was irrevocably waived.  It elevates form over substance to equate what occurred here to the true denials of counsel cited in Cronic.

Green, 809 F.2d at 1265 (Boggs, J. dissenting).  Exactly the same is true in this case where the majority has elevated form over substance to reverse convictions based on a false analogy to the denial of counsel during an entire stage of a criminal prosecution, the situation to which Cronic applies.

defendant's attorney might be so de minimis that there would be no constitutional significance." Id. at 1261. The counsel in that case missed cross-examining an important prosecution witness because he had left the trial to attend to other business. Id. at 1259–60. That did not happen in the present case where counsel cross-examined the witness and did so for 45 pages of the trial transcript. Instead of being "substantially similar" to this case, as the majority believes, the facts in Green are clearly distinguishable. In another case the Sixth Circuit again applied a presumption of prejudice where defense counsel "was absent on numerous occasions during trial," including for the entire testimony of two witnesses against him and the presentation of incriminating wiretap evidence. Olden v. United States, 224 F.3d 561, 568–69 (6th Cir. 2000). That did not happen here.

In United States v. Patterson, 215 F.3d 776, 783, 785–86 (7th Cir. 2000), vacated in part on other grounds, 531 U.S. 1033, 121 S.Ct. 621 (2000), the Seventh Circuit held that an inquiry into prejudice was unnecessary when defense counsel missed a lot of the trial. And I mean a lot. He "missed seven days of [a police officer's] testimony, four of five sessions of the jury instruction conference, most of the other defendants' closing arguments, and proceedings to address notes from the jury during deliberations." Id. at 783. Seven days is not seven minutes.

The attorney absences in all of the decisions from other circuits that the majority relies on were lengthy — far longer than in this case. In addition, the trial

70

court was aware of defense counsel's absence in almost every one of those cases.[5]

And in none of those cases was the testimony that counsel had missed repeated

after he returned to the courtroom, as it was here. While it may be said that the

absences of counsel in the cases cited by the majority were so substantial and "so

likely to prejudice the accused that the cost of litigating their effect [was]

unjustified," Cronic, 466 U.S. at 658, 104 S.Ct. at 2046, the same cannot be said of

the brief absence in this case. The closest case to the facts of this one is Kaid,

where the Second Circuit refused to presume prejudice and affirmed the

convictions. Today's decision stands alone as the most extreme application of

Cronic. It has no peers.

### 2. Temporary Attorney Absences Are Not Always Prejudicial and Courts Can Determine Whether Prejudice Occurred

In support of its position, the majority engages in a lengthy discussion to

establish that Cronic error and structural error are not subject to harmless error

review. See Maj. Opn. at 17–20. Everyone knows that. That is not the issue. The

issue is whether a brief attorney absence during the presentation of any inculpatory

evidence at all is always Cronic error no matter what. If it is a Cronic error, then it

is a structural error and not subject to review for harmlessness. If it is not a Cronic

---

[5] The only clear exception is that the trial court in Burdine was unaware that defense counsel was sleeping. Burdine, 262 F.3d at 389 (Barksdale, J., dissenting). The Patterson decision does not indicate whether the trial court was aware of the defense attorney's absence in that case.

71

error, then we review for harmlessness if the error was properly preserved at trial or only for plain error if it was not.

The majority asserts that whenever an attorney is not present during any part of the presentation of inculpatory evidence, no matter how small the part he missed, we should find Cronic error and presume prejudice because determining whether there actually was prejudice would be "an exacting and problematic undertaking" and a court can never "accurately determine whether and to what extent counsel's absence prejudiced" a defendant. Maj. Opn. at 20. The majority relies on a law review article for its belief about that instead of on relevant decisions that provide sounder guidance. See, e.g., United States v. Osterbrock, 891 F.2d 1216, 1218 (6th Cir. 1989) (applying harmless error review to attorney's trial absence when jury verdict was returned); Siverson v. O'Leary, 764 F.2d 1208, 1218–19 (7th Cir. 1985) (applying harmless error review to attorney's absence during jury deliberations and return of verdict); United States v. Calabro, 467 F.2d 973, 988–89 (2d Cir. 1972) (same).

Many state appellate courts have concluded that courts are capable of determining whether the temporary absence of an attorney prejudiced a defendant. See Jackson v. State, 983 So. 2d 562, 574–77 (Fla. 2008) (applying harmless error analysis to trial court's decision to hear testimony from the victim for purposes of sentencing the defendant while defense counsel was absent); Wilson v. State, 764

72

So. 2d 813, 816–19 (Fla. 4th DCA 2000) (applying harmless error analysis to defense counsel's absence during jury deliberations and proceedings involving a question from the jury); State v. Scherzer, 694 A.2d 196, 237–40 (N.J. Super. Ct. App. Div. 1997) (applying harmless error analysis where defense counsel was absent "from many pretrial proceedings; a portion of jury voir dire; several days of testimony during trial, including the entire testimony of the State's expert witness . . . ; parts of [the] codefendants' and the prosecutor's summations; a portion of the charge conference; some of the jury's questions during deliberations; and also the reading of the jury's verdict"); Hodges v. State, 116 S.W.3d 289, 292–94 (Tex. App. 2003) (applying harmless error analysis to defense counsel's absence during presentation of adverse testimony from a detective during the penalty phase of a case). In the Hodges decision, the Texas Court of Criminal Appeals stated that it agreed with our decision in Vines that a temporary absence of counsel during part of the trial does not necessarily infect the entire trial and preclude application of the harmless error doctrine. Hodges, 164 S.W.3d at 294 n.7.

In our decision in Vines, we specifically held that:

[T]he temporary absence of a defendant's trial counsel during a portion of the actual trial does not necessarily affect the conduct of the entire trial. While trial counsel may exercise poor judgment in absenting himself or herself from a portion of a trial, such flawed judgment does not necessarily infect the entire trial.

73

28 F.3d at 1129 (emphasis omitted).  We determined in <u>Vines</u> that harmless error analysis was appropriate after concluding that the attorney absence in that case was neither <u>Cronic</u> error nor structural error, but instead a "trial error."  <u>Id.</u> at 1128–29. Like the attorney's absence in <u>Vines</u>, the attorney's brief absence in this case does not qualify as <u>Cronic</u> error or structural error because, as explained in Part II.C above, it did not render Roy's entire trial unreliable.  <u>See id.</u> at 1129 (explaining that structural defects, such as "the <u>total</u> deprivation of counsel," "necessarily affect the conduct of the entire trial" and involve errors so egregious that "in their absence no criminal trial can be deemed reliable").

Although our conclusion in <u>Vines</u> that the <u>Cronic</u> presumption of prejudice did not apply came after we had found that the evidence introduced during counsel's absence was not directly inculpatory, <u>see</u> <u>Vines</u>, 28 F.3d at 1128, we did not hold that the <u>Cronic</u> presumption applies whenever any inculpatory evidence is presented during counsel's absence.  We could not have held that in <u>Vines</u> because those were not the facts before us in that case.  <u>See</u> <u>Watts v. BellSouth Telecomms., Inc.</u>, 316 F.3d 1203, 1207 (11th Cir. 2003) ("[J]udicial decisions cannot make law beyond the facts of the cases in which those decisions are announced."); <u>see also</u> <u>Anders v. Hometown Mortg. Servs., Inc.</u>, 346 F.3d 1024, 1031 (11th Cir. 2003).  We have never held that prejudice is conclusively

presumed if any inculpatory evidence at all is taken in counsel's absence, and we should not be holding that today.

Any error involving the seven-minute absence of Roy's counsel during the testimony of one of thirteen government witnesses during a six-day trial, where the same evidence also came in during testimony the witness gave after counsel returned, is at most a "trial error."  As we explained in Vines:

> A trial error is an error which occurs during the presentation of a case to a jury, and which may therefore be quantitatively assessed . . . in order to determine whether [it] was harmless.

28 F.3d at 1129 (quotation marks and brackets omitted).  Again, the record in this case is such that we can assess the testimony that occurred in the seven-minute absence of Roy's counsel to determine whether that absence was harmless.  See supra Part II.C.

Despite these controlling principles, the majority insists that prejudice must be presumed because the absence of counsel during the presentation of inculpatory evidence "eliminates the opportunity to decide whether to lodge an objection and how to frame the objection."  Maj. Opn. at 13.  That assertion, as well as the majority's claim that Roy's attorney "could not have known" what evidence he missed, Maj. Opn. at 21, is simply not correct.  A defense attorney who misses any moment of the direct examination of a government witness could, upon returning to the courtroom, ask that the transcript be read back outside the presence of the

jury and request that any objectionable testimony be stricken from the record. And once that testimony has been read back to defense counsel, he would have full knowledge of the witness' statements, which he could then challenge on cross-examination.

In this case, as far as we know, Roy's attorney did not ask for an opportunity to review the portion of Deputy Longson's testimony that he had missed. But we do know that there was no lost-objection prejudice from his seven-minute absence because no exhibits were admitted during that time, and when the same testimony was presented immediately after counsel returned, he did not object to any of it. There is no valid objection that he could have made had he been there the seven minutes he was absent (Roy's appellate counsel has not suggested one), and counsel was able to vigorously cross-examine Longson about his testimony after he returned to the courtroom.

The defect in the majority's reasoning is also apparent from the fact that courts regularly analyze whether an attorney's failure to object resulted in prejudice. See, e.g., Lockhart v. Fretwell, 506 U.S. 364, 366, 113 S.Ct. 838, 841 (1993) (determining whether petitioner was prejudiced by trial counsel's "failure to make an objection in a state criminal sentencing proceeding" in a capital case); Gordon v. United States, 518 F.3d 1291, 1299–1301 (11th Cir. 2008) (determining whether trial "counsel's failure to object to an absence of inquiry about the right to

allocute" prejudiced the habeas petitioner); Purvis v. Crosby, 451 F.3d 734, 738 (11th Cir. 2006) (determining whether trial counsel's failure to object to the closure of the courtroom during a young victim's testimony in a child molestation trial prejudiced the habeas petitioner); Sims v. Singletary, 155 F.3d 1297, 1309 (11th Cir. 1998) (noting that "assuming arguendo that counsel's failure to object to the prosecutor's comments constituted ineffective assistance, [the petitioner] has shown no prejudice as a result of this inaction").  Although the majority contends that the prejudice inquiry is an "exacting and problematic undertaking," there is nothing unusual or unusually difficult about determining whether a failure to object was prejudicial.  Courts do it all the time.  The majority's position that we cannot or should not determine whether a failure to object was prejudicial is contrary to binding precedent and our regular practice.

The majority also asserts that counsel's absence during the presentation of any inculpatory testimony "eliminates . . . the ability to conduct cross-examination."  Maj. Opn. at 13.  Not necessarily, and not in this case.  As I mentioned earlier, once counsel returns to the courtroom he can ask to have the transcript read back to him outside the presence of the jury.  That would provide him with full knowledge of the witness' statements, which he could then challenge on cross-examination.  And as this case illustrates, that approach may not even be necessary where the witness repeats all of his testimony after defense counsel

returns to the courtroom.  It is obvious in this case that defense counsel's absence for seven minutes of Longson's testimony did not eliminate his ability to cross-examine that witness.  The record shows that the testimony Deputy Longson gave during counsel's seven-minute absence was repeated immediately after he returned, and counsel vigorously cross-examined Longson about it.

And even if defense counsel's ability to cross-examine Longson had been impeded, the majority's reasoning is flawed because it assumes that any gap or shortcoming in cross-examination cannot be examined for its prejudicial effect. Although the majority may believe that it is "an exacting and problematic" task to do so, courts regularly inquire into whether an attorney's failure to cross-examine a witness in a particular way or to use a particular strategy or tactic in cross-examination prejudiced the defendant.  See, e.g., Strickler v. Greene, 527 U.S. 263, 289–95, 296, 119 S.Ct. 1936, 1952–55 (1999) (determining whether petitioner had shown prejudice from being deprived of any opportunity to use certain withheld documents to impeach a key prosecution witness, and finding that he had); Fugate v. Head, 261 F.3d 1206, 1220 (11th Cir. 2001) (determining whether petitioner had shown prejudice from counsel's failure during cross-examination to impeach the sole eyewitness to the murder with his prior inconsistent statement to the police, and finding that he had not); id. at 1220–21 (determining whether petitioner had shown prejudice from counsel's failure during cross-examination of the medical

examiner to impeach him with inconsistencies between his autopsy report and his testimony, and finding that he had not); Nixon v. Newsome, 888 F.2d 112, 116 (11th Cir. 1989) (determining whether petitioner had shown prejudice from his counsel's failure during cross-examination to impeach the key prosecution witness with her prior inconsistent testimony, and finding that he had); Smith v. Wainwright, 799 F.2d 1442, 1444 (11th Cir. 1986) (determining whether petitioner had shown prejudice from his counsel's failure during cross-examination to impeach the two prosecution witnesses with their prior inconsistent statements, and finding that he had not).  All of those decisions and others show that courts can, and regularly do, determine whether a failure to cross-examine a witness about a particular fact or in a particular way was prejudicial.  There is nothing unusual or especially difficult about doing that.  If there were, we would not do it routinely. Yet we do.  We could and should do it in this case.

The majority also theorizes that prejudice must be presumed from defense counsel's brief absence because "a defendant may irretrievably lose available defenses and rights during direct testimony of a prosecution witness."  Maj. Opn. at 13.  The first problem with that theory is that it confuses presentation of the government's case at trial with arraignment.  The only authorities that the majority cites for its proposition are two decisions that involved a defense attorney's absence from arraignment.  See Hamilton, 368 U.S. at 54, 82 S.Ct. at 159; White,

79

373 U.S. at 60, 83 S.Ct. at 1051.  There is a difference between arraignment, where certain defenses must be asserted or lost, and the direct examination of a prosecution witness during the middle of a trial, where the defendant is not required to assert defenses.

The second problem with the majority's lost-defenses theory is that, even if a defense is somehow lost by defense counsel missing a few minutes of a direct examination, courts regularly inquire into whether a defense attorney's failure to raise a defense at trial prejudiced the defendant.  See Roberts v. Comm'r, Ala. Dep't of Corr., 677 F.3d 1086, 1090–93 (11th Cir. 2012) (insanity defense); Pietri v. Fla. Dep't of Corr., 641 F.3d 1276, 1280–84 (11th Cir. 2011) (voluntary intoxication defense); West v. United States, 631 F.3d 563, 567–68 (1st Cir. 2011) (entrapment defense); Currier v. United States, 320 F.3d 52, 56–57 (1st Cir. 2003) (necessity defense).  We did just that, just last year, when we held that an attorney's failure to assert a voluntary intoxication defense on behalf of a capital defendant was not prejudicial.  See Reaves v. Sec'y, Fla. Dep't of Corr., 717 F.3d 886, 900–05 (11th Cir. 2013).  The majority, presumably, would have decided the "lost defenses" cases differently than this Court did in Roberts, Pietri, and Reaves because it believes that looking into prejudice is an "exacting and problematic" endeavor.  But binding precedent is binding precedent, and the majority's position that a prejudice inquiry is impossible, or at least should not be permitted, on a lost-

defense claim is contrary to all of that binding precedent. In any event, neither the majority nor Roy's appellate counsel has been able to point to any conceivable defenses that were lost by defense counsel's seven-minute absence in this case.

Although the majority does not argue this, a defense counsel's temporary absence might also be prejudicial if it results in the failure to present evidence countering the testimony of an adverse witness. But that possibility does not require a presumption of prejudice because courts regularly determine whether an attorney's failure to present evidence prejudiced the defendant. See, e.g., Hinton v. Alabama, — U.S. —, 134 S.Ct. 1081, 1089–90 (2014) (vacating and remanding to allow the district court to determine whether petitioner was prejudiced by counsel's failure to request additional funding in order to hire an adequate expert); Harrington v. Richter, — U.S. —, 131 S.Ct. 770, 791–92 (2011) (determining whether petitioner was prejudiced by counsel's failure to present expert testimony on serology, pathology, and blood spatter patterns); Jackson v. Herring, 42 F.3d 1350, 1362, 1368–69 (11th Cir. 1995) (determining whether petitioner was prejudiced by counsel's failure to investigate and present mitigating evidence at sentencing). This kind of prejudice inquiry is old hat for courts. We do it often, without any suggestion that it is impossible or too much trouble. It is part of our judicial duties.

81

Despite all of this long-standing precedent, the majority insists that we must presume prejudice because "[i]t would be difficult, if not impossible, for us as a reviewing court to discern, on a cold record, the reaction of the jury to the evidence presented and, therefore, to what extent counsel may have been able to react in a manner that would improve his client's likelihood of acquittal." Maj. Opn. at 20. Really? Does this mean that in order to be effective an attorney must constantly monitor the jurors' faces for reactions to the testimony? Does it mean that if defense counsel focuses on the witness or is reading his notes during the testimony, prejudice must be presumed from his failure to watch "the reaction of the jury to the evidence"? In any event, the majority's assertion, which is supported only by citation to a Nebraska Law Review article, goes against all of the binding precedent cited in this section, in addition to all of our case law dealing with claims of ineffective assistance of counsel, which illustrates that courts regularly rely on a "cold record" to determine whether prejudice actually occurred.

## III.  The Majority's Holding Will Have Far Reaching Adverse Effects

Under the majority's holding and reasoning, if defense counsel misses even a single inculpatory question and answer, courts in this circuit must conclusively presume prejudice and set aside any conviction no matter how clearly and irrefutably the record establishes that there was no prejudice. Even when a court is firmly convinced there is no prejudice. No exceptions. It does not matter

what the facts are, it does not matter how overwhelming the other evidence of guilt is, it does not matter if no reasonable person could believe that counsel's momentary absence made any difference at all.  Prejudice is not required because it is conclusively presumed, which in this instance means that we must pretend that something exists even if we know that it does not.  Nothing else will ever matter but the majority's ironclad rule that nothing else matters.  And the majority's rule has a wide kill zone.  Not only must the conviction on the count that the missed testimony concerns be extinguished, but every conviction on every count in the indictment must be as well.  No exceptions.

The majority makes a futile attempt to persuade us that maybe — just maybe — its all-encompassing rule might not encompass all inculpatory testimony after all.  It points out that counsel's absence came during not just the testimony of any old witness for the prosecution but during the testimony of the deputy sheriff who was the government's specialist expert witness.  <u>See</u> Maj. Opn. at 26.  But so what?  For purposes of the pretend prejudice rule what principled basis is there for distinguishing one category or type of prosecution witness from another?  Suppose the deputy sheriff had not been testifying as an expert witness in the field of computer forensics but for some other reason.  Would that have mattered; if so, why?  Or suppose the government's computer expert witness had not been a deputy but instead had been an outside expert hired on a contract basis.  Would

83

that have mattered; if so, why?  Or suppose the witness testifying while counsel was out had been a non-law enforcement, non-expert witness who nonetheless gave incriminating testimony against Roy.  Would that have mattered; if so, why?  The point is that all, or virtually all, government witnesses give inculpatory testimony against the defendant, which is why they are government witnesses.  There is no principled basis for distinguishing one from another.  The majority's absolute, all-encompassing pretend prejudice rule either encompasses all witnesses who give any inculpatory testimony or it encompasses none.  It ought to be none.

The majority opinion and its ironclad, pretend-prejudice rule will as a practical matter require district judges to closely monitor their courtrooms to ensure that each attorney arrives on time in the morning, returns promptly after every break, is at the bench during each discussion there, and doesn't step out of the courtroom for even a moment while testimony is being taken.  Judges, like kindergarten teachers, will be forced to keep an eye on their lawyer-children at all times to prevent one from toddling away without being noticed.  How this is to be done, given everything else that is going on in a trial and competing for the judge's attention, the majority does not say.  Maybe the requirement of perfect attendance during every minute of the trial can be achieved by forcing each lawyer to wear an ankle bracelet rigged to set off an alarm when he strays out of range from counsel table.  That might do the trick.  Given all of the important duties a judge has during

a trial, the majority creates a misguided rule that now requires a judge to keep an eye on all of the attorneys at all times throughout a trial, under pain of automatic reversal if one attorney momentarily steps away unnoticed.

There also is no reason why this "Roy rule" won't apply to situations where defense counsel's constructive or actual absence is likely to go unnoticed by the prosecution and the judge, such as where defense counsel dozes during trial or in a large multi-defendant trial where counsel is actually absent. There is no principled basis not to apply the rule of today's decision to those two situations as well. Why would the risk of prejudice, or the justification for pretending that there was prejudice, be any less if Roy's counsel had dozed off during those seven minutes and, instead of being physically away from the courtroom, was away in dreamland? Either way the attorney would not be conscious of what was being said. All an attorney now has to do to get his client an automatic reversal of any conviction is file an affidavit stating that he had inadvertently dozed off during two or three minutes while a government witness was testifying against his client and for that reason missed some of the testimony. Remember that under the majority's rule once an attorney's absence, in this hypothetical a mental absence, is shown, prejudice must be conclusively presumed and all of the defendant's convictions overturned. No questions may be asked of counsel. So trial judges will have the duty not only to ensure that every defendant's attorney is physically present during

85

every minute of the trial but also that every attorney is wide awake and alert at all times. The prudent judge may want to have each counsel table stocked with caffeine tablets and energy drinks.[6]

Whatever measures a judge takes in response to today's ruling, it will be practically impossible to prevent presumptive prejudice error in a large, multi-defendant, long-running trial. See Green, 809 F.2d at 1265 (Boggs, J. dissenting) ("If a reversal is mandated whenever counsel (even retained) is absent from the courtroom for any significant period, we make such an escape a sure ticket to a new trial. In multi-defendant cases, judges will be required to keep a continual head count . . . lest cagey counsel be able to invoke this new rule."). After the judge, jury, prosecutors, defense attorneys, and others have spent months in a complex trial and verdicts of conviction have been returned, none of it will mean anything for any defendant whose attorney can show that he was absent or dozed off during any of the testimony from any of the many witnesses against his client. That will be true even if the attorney missed only a few of the thousands of questions and answers that directly or indirectly inculpated his client during the

---

[6] Judges might also consider converting their bailiffs into something akin to Puritan Tithingmen. Those "ancient watchm[e]n of the congregation" had among their duties "disturb[ing] the slumbers of age" and seeing to it "that all persons were attentive" throughout seemingly interminable sermons. They carried a wooden rod tipped at one end with a squirrel's tail used to awaken female congregants who dozed off. At the other end was a brass tip, or in some cases a deer's hoof, "which carried sharp conviction to men and boys" who dared doze. Herbert B. Adams, Saxon Tithingmen in America 1 & n.1 (1883).

86

long trial. It will not matter, as the majority insists it does not matter in this case, whether the inculpatory testimony that the attorney missed was repeated in his (conscious) presence. And it will not matter in the least why the attorney was absent or whether the judge noticed the absence. That is the rule the majority adopts.

The majority suggests that its no-exceptions, pretend-prejudice rule is particularly warranted in this case because there was only a single defendant and a single defense attorney for the court to monitor. See Maj. Opn. at 2, 28. But the rationale for the Cronic rule, and the majority's reason for applying it and presuming prejudice in this case, has nothing to do with the number of defendants or defense attorneys in a particular case. The Cronic opinion does not talk about the ease of preventing an error but instead about the great likelihood of prejudice from certain errors, such as the total deprivation of counsel from an entire stage of the trial. See 466 U.S. at 658–60, 104 S.Ct. at 2046–47. Why would the risk of prejudice, or the justification for presuming it, be any less if Roy had been tried with eight or ten codefendants and the same inculpatory evidence had been presented while his attorney was absent? There is no logical reason why the likelihood that an attorney absence is overlooked, or the difficulty in guarding against an absence and ensuring perfect attendance and perfect attention, would change the prejudicial effect of an absence. If the prejudicial effect of a seven-

87

minute absence must be conclusively presumed in this case involving a six-day trial with one defendant, it must also be conclusively presumed when there is a seven-minute absence during a six-month trial with a dozen defendants. The presumption of prejudice that the majority has written into our circuit law logically must apply in all trials or in none. It should be none.

The majority's rule permits no inquiry into the reason or motivation behind the absence, as its refusal to permit a remand for an evidentiary inquiry in this case demonstrates. Even if a defense attorney deliberately steps out of the courtroom for a minute or two for the purpose of putting in his pocket a get-out-of-jail-free card for his client, he still gets to play that card. His absence trumps his client's conviction, which must be set aside, and no further questions may be asked because nothing else matters. We must always pretend that prejudice exists. Absence, whatever the reason or motive, equals reversal.

The majority tells us not to worry about an attorney deliberately missing a few minutes of testimony to guarantee that any conviction of his client will be set aside. See Maj. Opn. at 27. It could not possibly be a problem, we are told, because lawyers are "officers of the Court bound by rules of professional responsibility." Maj. Opn. at 27. The majority believes that the threat of disciplinary proceedings will prevent defense attorneys from taking advantage of

88

today's holding.  That is not true, but "[i]sn't it pretty to think so?"[7]  If lawyers were angels, the majority's belief that all lawyers are always ethical would make sense, but if they were angels we would not need ethical rules and disciplinary bodies.  Lawyers are people and like all people they have flaws and failings and sometimes behave improperly and unethically.  The majority's contrary theory does not fit the world in which we live.

And the facts belie the majority's theory.  Lawyers practicing in our circuit are regularly disciplined and even prosecuted for violating their ethical duties and the law.  The Florida Supreme Court enters hundreds of orders each year disciplining attorneys for unethical conduct.[8]  The Georgia Supreme Court enters more than a hundred each year,[9] and the Alabama Supreme Court is not far behind.[10]  In all, there were more than 600 disciplinary orders entered against lawyers in the three states of our circuit during 2011, the last published reporting

---

[7] Ernest Hemingway, The Sun Also Rises 247 (Macmillan Publ'g Co. 1987) (1926).

[8] Florida attorneys were publically disciplined in 380 instances in 2011, 380 instances in 2012, and 233 instances in 2013.  See Standing Comm. on Prof'l Discipline, ABA Ctr. for Prof'l Responsibility, 2011 Survey on Lawyer Discipline Systems (S.O.L.D.) (2013).  The ABA has not yet published its S.O.L.D. reports for 2012 and 2013, and the figures for those years come from preliminary data submitted to the ABA by Florida's disciplinary agency.

[9] Georgia lawyers were disciplined in 177 instances in 2011, 149 instances in 2012, and 120 instances in 2013.  See ABA, supra.  Like the 2012 and 2013 statistics for Florida, Georgia's figures for those two years come from preliminary data collected by the ABA.

[10] Alabama lawyers were sanctioned in 82 instances in 2011.  See ABA, supra.  Alabama's figures for 2012 and 2013 have not yet been reported to the ABA.

year.[11]  And those are counting only the cases where lawyers were caught and formally disciplined.

The temptation to game the system and take advantage of the guaranteed reversal that the Roy rule creates will be especially great in capital cases.  Many attorneys who represent capital defendants sincerely believe that the death penalty is not only bad policy but is also immoral.  They can literally save their client's life, or at least delay his death, by strategically slipping out of the courtroom for a few minutes, or returning to it a little late, while the prosecution's case against him is being presented.  And what about counsel representing a defendant who is a member of a violent gang?  His client may insist that counsel game the system with a brief absence so that any conviction can be overturned under "the Roy rule."  The client's "request" may be one that counsel finds difficult to refuse.

The majority is confident that lawyers won't place their licenses in jeopardy by strategically taking advantage of today's holding.  That confidence is especially unwarranted because there is so little chance that an attorney who does take advantage of the "Roy rule" would ever suffer any consequences.  If a trial judge notices defense counsel leaving the courtroom in the middle of trial, the penalty for that act is relatively small.  See United States v. Fakhoury, 819 F.2d 1415, 1424

---

[11] See supra nn.8–10.

(7th Cir. 1987) ("[T]rial counsel was reprimanded by the district judge for leaving the courtroom when the government was presenting its case . . . ."). If the trial judge does not notice defense counsel's brief absence and the issue is raised for the first time on appeal, counsel can avoid ever having to account for his absence by having a new attorney represent the defendant on appeal. Recall that in this case trial counsel has never been held to account for his absence or even asked about it. The majority sees no reason for inquiring into the absence because all that matters to the majority is the fact that it occurred, not the reason it occurred. And even if there were an inquiry, how would one ever prove that the reason an attorney was out of the courtroom was his subjective intent to ensure a reversal of any conviction?

And what about a "constructive" absence? If a defense attorney decides on the 15th day of a trial that the proceeding is not going well for his client, what is to stop him from closing his eyes for a minute or two during the examination of a government witness, approaching the judge to claim that he was "sleeping" when his eyes were closed, and then asserting that his client is entitled to a mistrial because he was constructively absent during the presentation of inculpatory evidence? How could the court know whether the attorney had in fact been asleep?

For all of these reasons, the majority's reasoning is unpersuasive and the "very narrow" presumed prejudice rule of Cronic should not be applied in this case. See Stano, 921 F.2d at 1153 (quotation marks omitted).

## IV.  How We Should Decide This Case

Because any error involved in counsel's momentary absence from the courtroom was not Cronic error, it was at most trial error and trial errors are subject to the normal rules of review. See Vines, 28 F.3d at 1128–29.

## A.  The Contemporaneous Objection Rule Furthers Important Interests of Our Criminal Justice System and Should Apply to Brief Attorney Absences from the Courtroom

The contemporaneous objection rule requires an objection in the trial court before a defendant is entitled to plenary review on appeal. The rule "fosters finality of judgment and deters sandbagging" by preventing a party from "saving an issue for appeal in hopes of having another shot at trial if the first one misses." United States v. Rodriguez, 627 F.3d 1372, 1379 (11th Cir. 2010) (quotation marks omitted). It also promotes "the salutary interest of making the trial the main event" because "[f]ailure to enforce it tends to detract from the perception of the trial of a criminal case . . . as a decisive and portentous event." Id. (quotation marks omitted and ellipsis in original). By requiring timely objections, we "allow[] trial courts to develop a full record on [an] issue, consider the matter, and correct any error before substantial judicial resources are wasted on appeal and then in an

92

unnecessary retrial." Id. (quotation marks omitted).  Finally, the rule provides substantial assistance for appellate review because "[a] full record and a prior decision in the district court are essential ingredients to our substantive review of issues." Id. (quotation marks omitted).  An objection allows for the "the record to be made with respect to a constitutional claim when the recollections of witnesses are freshest" and "enables the judge who observed the demeanor of those witnesses to make the factual determinations necessary for properly deciding the federal constitutional question." Wainwright v. Sykes, 433 U.S. 72, 88, 97 S.Ct. 2497, 2507 (1977).

The Supreme Court has emphasized the importance of the contemporaneous objection rule and the values it supports.  As the Court wrote in Sykes:

> [When a] defendant has been accused of a serious crime, [the trial] is the time and place set for him to be tried by a jury of his peers and found either guilty or not guilty by that jury.  To the greatest extent possible all issues which bear on this charge should be determined in this proceeding: the accused is in the court-room, the jury is in the box, the judge is on the bench, and the witnesses, having been subpoenaed and duly sworn, await their turn to testify.  Society's resources have been concentrated at that time and place in order to decide, within the limits of human fallibility, the question of guilt or innocence of one of its citizens.  Any procedural rule which encourages the result that those proceedings be as free of error as possible is thoroughly desirable, and the contemporaneous-objection rule surely falls within this classification.

Id. at 90, 97 S.Ct. at 2508.

93

By not objecting when he returned to the courtroom to testimony having been taken during his brief absence, Roy's trial counsel deprived the district court of an opportunity to address the problem on the spot, just after it occurred, and while everyone's recollection of the events were as fresh as they could be. If counsel had objected, the attorneys and the judge could have decided what, if any, action was appropriate to remedy the problem. One possibility is that the court could have had the court reporter, outside the presence of the jury, read to counsel the questions and answers he had missed, and then let counsel decide whether he wanted some or all of them stricken and the jury instructed to disregard them. That way, when those questions were asked again in his presence, counsel could object to any of them for which there was any arguable basis for objection.

By requiring a timely objection, the contemporaneous objection rule encourages remedies. Instead of fostering that laudatory policy, the majority's decision rewards counsel's silence with an automatic reversal. It "encourage[s] 'sandbagging' on the part of defense lawyers." See id. at 89, 97 S.Ct. at 2508. As we have asked before, "[W]hat lawyer will not be 'understandably reluctant' to object if no objection is required? By not objecting the lawyer can avoid any risk that . . . an actual error [will be] corrected on the spot . . . ." Rodriguez, 627 F.3d at 1380. By remaining silent, instead of objecting, under today's holding defense

attorneys can get "another shot at trial if the first one misses."  Id. at 1379

(quotation marks omitted).

## B.  Roy Has Failed to Show, or Even Assert, That His Counsel Was Unaware That Testimony Had Been Taken During His Brief Absence

If Roy's attorney was unaware that testimony had been taken while he was

absent, his failure to object probably should be overlooked.  But counsel must have

known, and Roy has never even suggested that counsel did not know.

Counsel knew that the judge had informed everyone before the lunch recess

that the trial would resume at 1:30 p.m., and he knew that he was walking in late.

When counsel walked into the courtroom, the jury was sitting in the box, Deputy

Longson was on the witness stand, and the prosecutor was asking the court for a

moment to approach defense counsel following Longson's response to one of her

questions.  Id. at 108.  The prosecutor then approached and conferred with defense

counsel, and although the record does not tell us what they discussed, it seems

likely that they talked about the fact that defense counsel had missed some

testimony.  See id.  Under all of the circumstances, it is extremely doubtful that

Roy's attorney did not know that the trial had recommenced without him.[12]

_____

[12] Even if the scene confronting defense counsel when he returned to the courtroom had not signaled to him that the trial had continued in his absence, testimony from Deputy Longson soon after counsel's return would have alerted him to that fact.  With counsel back in the courtroom, Longson specifically testified that one of the photos was one he had "described earlier" showing "a white female who is bound to a table by her feet with a red and white ski

Indeed, Roy has not even suggested that his attorney was unaware that he had missed some of Longson's direct examination.

Because Roy's counsel failed to object to the error, our review should be for plain error only. See United States v. Williams, 527 F.3d 1235, 1239 (11th Cir. 2008). The majority's claim that we should not review the error that occurred at Roy's trial under the plain error standard is wrong because it relies on the faulty premise that a Cronic error occurred in this case. See Maj. Opn. at 21–22. None of the opinions that the majority relies on supports its position. First, the majority relies on Justice Souter's dissent in Mickens v. Taylor, 535 U.S. 162, 204, 122 S.Ct. 1237, 1261 (2002) (Souter, J., dissenting), which was just that, a dissenting opinion, not an opinion of the Court. The dissenting opinion asserted that a court's error should not be excused simply because an attorney failed to object, but that extreme position would apply to all judicial errors, thereby abolishing the contemporaneous objection rule. Such a proposal is untenable and goes against the settled law that defendants must object even to judicially created errors in order to properly preserve them for full review on appeal. See, e.g., United States v. Davila, 749 F.3d 982, 993–94, 998–99 (11th Cir. 2014) (applying plain error review where defendant failed to object to magistrate judge's "emphatic and highly

rope." The record shows that the only time that photo had been described earlier was during the part of Longson's testimony that occurred while counsel was out of the courtroom.

improper" remarks "regarding the desirability of a guilty plea"). The majority also relies on Wood v. Georgia, 450 U.S. 261, 265 n.5, 101 S.Ct. 1097, 1100 n.5 (1981), but in that case the Supreme Court did not directly address an issue that had not been properly preserved in the trial court. Instead, it remanded the case for consideration of a possible due process violation that was apparent from the facts of the case but had not been raised on appeal or in the defendant's petition for certiorari. Id. at 264–65, 101 S.Ct. at 1100. The Supreme Court chose that approach only for prudential reasons because it wanted to avoid deciding a novel constitutional question that had been raised on appeal. Id. at 265, 101 S.Ct. at 1100. Finally, the majority relies on our decision in Harding v. Davis, 878 F.2d 1341 (11th Cir. 1989), but unlike this case, Harding involved actual Cronic error. In that case, as a result of a disagreement with his client, defense counsel "remained silent through virtually the entire trial, except for various remarks indicating that [the defendant] did not desire his assistance." Id. at 1343. As a result, it was as though Harding had no counsel at all because his attorney completely failed to subject the prosecution's case to any meaningful adversarial testing at all, an obvious Cronic violation. See Cronic, 466 U.S. at 659, 104 S.Ct. at 2047. None of those opinions supports the majority's assertion that plain error review is inappropriate in this case.

## C.  Roy Cannot Prevail on Plain Error Review

97

Under plain error review, Roy has the burden of establishing that "(1) an error occurred; (2) the error was plain; (3) it affected [his] substantial rights; and (4) it seriously affected the fairness of the judicial proceedings." Rodriguez, 627 F.3d at 1380 (quotation marks omitted).  We need not look beyond the third requirement to decide that Roy has not established plain error.  To show that an error affected a defendant's substantial rights for plain error purposes, a defendant has the burden of proving "a reasonable probability of a different result" but for the error.  Id. at 1382 (quotation marks omitted).  If we cannot tell whether an unobjected to error prejudiced a defendant, the defendant loses.  United States v. Rodriguez, 398 F.3d 1291, 1299–1300 (11th Cir. 2005) (holding that where it is uncertain whether prejudice exists, the defendant loses).

Roy has not come close to establishing a reasonable probability of a different result but for his counsel's absence during seven minutes of testimony, less than one-half of one percent of the trial.  In fact, the record overwhelmingly establishes that the brief absence cannot have affected the jury's verdict on Count 1.  See supra pp. 29–32.  Nor could it have affected the jury verdict on Counts 2 – 5.  See supra pp. 32–33.  There is no reasonable probability of a different result but for the error, which the majority implicitly recognizes by insisting that we apply Cronic and pretend that there was prejudice.

### D.  Roy Could Not Prevail Even Under Plenary Review

98

Even if we ignore the failure to object, Roy's convictions should still be affirmed under plenary review because of the harmless error rule.

Contrary to the majority's argument, Maj. Opn. at 17–23, harmless error analysis is not inappropriate, much less impossible, to apply to brief absences of counsel from trial.  (And the standard is not whether the error was de minimis, see Maj. Opn. at 27, but whether it was harmless.  It is the harmless error rule, not the de minimis error rule.)

As the Supreme Court has held, application of the harmless error doctrine "promotes public respect for the criminal process by focusing on the underlying fairness of the trial."  Neder v. United States, 527 U.S. 1, 18, 119 S.Ct. 1827, 1838 (1999) (quotation marks omitted).  When a constitutional violation occurs in a criminal trial, harmless error analysis is the norm, not the exception.  See, e.g., Fulminante, 499 U.S. at 306, 111 S.Ct. at 1263 ("Since this Court's landmark decision in Chapman v. California, in which we adopted the general rule that a constitutional error does not automatically require reversal of a conviction, the Court has applied harmless-error analysis to a wide range of errors and has recognized that most constitutional errors can be harmless.") (citation omitted) (emphasis added); Rose v. Clark, 478 U.S. 570, 579, 106 S.Ct. 3101, 3106 (1986) ("[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to

99

harmless-error analysis.  The thrust of the many constitutional rules governing the conduct of criminal trials is to ensure that those trials lead to fair and correct judgments.  Where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in fairness has been satisfied and the judgment should be affirmed.").  The majority's contrary position flies in the face of the Supreme Court's teaching in Fulminante, Chapman, Rose, and a host of other decisions.  See also Vines, 28 F.3d at 1128 (applying harmless error review after concluding "that the temporary absence of a defendant's trial counsel during a portion of the actual trial does not necessarily affect the conduct of the entire trial").

The rule the majority adopts today, and its reversal of Roy's well-deserved convictions without regard to whether the error affected the outcome of the trial, smacks of a "sporting theory of justice."  See United States v. Agurs, 427 U.S. 97, 108, 96 S.Ct. 2392, 2400 (1976) (quotation marks omitted).  It will undermine fairness in the administration of justice by inviting reversals that have nothing to do with the merits of a case.  As the Supreme Court has repeatedly emphasized, "Reversal for error, regardless of its effect on the judgment, encourages litigants to abuse the judicial process and bestirs the public to ridicule it."  Rose, 478 U.S. at 579, 106 S.Ct. at 3106 (quotation marks omitted); accord Neder, 527 U.S. at 18, 119 S.Ct. at 1838; Johnson v. United States, 520 U.S. 461, 470, 117 S.Ct. 1544,

100

1550 (1997); see also Van Arsdall, 475 U.S. at 681, 106 S.Ct. at 1436 ("As we have stressed on more than one occasion, the Constitution entitles a criminal defendant to a fair trial, not a perfect one."); Snyder v. Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 338 (1934) ("[J]ustice, though due to the accused, is due to the accuser also.  The concept of fairness must not be strained till it is narrowed to a filament.  We are to keep the balance true.").

The public loses confidence in the judicial process when reliable convictions are reversed on technical errors that did not affect the result.  See United States v. Keys, 95 F.3d 874, 883 (9th Cir. 1996) (Kleinfeld, J., dissenting) ("What really hurts the reputation of judicial proceedings is vacating a criminal conviction because of what laymen properly call a technicality, that is, a technical defect which made no practical difference in the particular case.") (quotation marks omitted), vacated, 520 U.S. 1226, 117 S.Ct. 1816 (1997).  Any rule that requires us as judges to decide a case by pretending that something exists, when we as men and women know that it does not, risks undermining the public's confidence in the administration of justice.  That is another reason the majority's "Roy rule" is wrong.